Bennie **LAZAROV**, Jacob Carl Epstein, Appellants,

v.

**UNITED STATES of America,** Appellee.

Nos. 12172, 12173.

United States Court of Appeals
Sixth Circuit.

June 28, 1955.

Certiorari Denied Nov. 7, 1955.

See 76 S.Ct. 140.

William Gerber, Memphis, Tenn., L. E. Gwinn, Memphis, Tenn. (Irving M. Strauch, Memphis, Tenn., on the brief), for appellants.

Millsaps Fitzhugh, U. S. Atty., Warner Hodges, Asst. U. S. Atty., Memphis, Tenn. (Warren Olney, III, Washington, D. C., Edward N. Vaden, Memphis, Tenn., on the brief), for appellee.

Before ALLEN, McALLISTER, and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

This appeal from a criminal conviction is largely a fact case. A great part of the evidence upon which the government relies does not sustain the conviction. Many of the contentions of appellants that there is no substantial evidence to support a verdict of their guilt, fail in the light of the complete proofs. Accordingly, a somewhat developed statement of the facts and the testimony is necessary to an understanding and adjudication of the case.

Appellants, Lazarov and Epstein, were charged in an indictment with conspir-

ing to defraud the United States by impairing, obstructing, and defeating the lawful right and function of the government in the sale and disposal of certain salvage rope by the Army Corps of Engineers. Jointly indicted with Lazarov and Epstein, was Don J. Kimberling, an official of the government. Kimberling was found not guilty by the jury. Lazarov and Epstein were convicted, and they appeal.

Appellants claim that the verdict was not sustained by substantial evidence that appellants conspired to commit the offense charged; that the trial court erred in its instructions to the jury, and in refusing to instruct as requested by appellants; and that the argument to the jury by the district attorney constituted prejudicial reversible error.

To state the facts in somewhat more detail, the offense alleged was that the three men above named conspired to defraud the government in the purchase of rope which appellants bought at the depot of the Army Engineers located on the right bank of the Mississippi River at West Memphis, Arkansas. The rope in question was sold to appellants at auction at the government depot, but since the exact quantity in weight was not ascertained at the time of sale, the entire amount on hand was sold, appellants agreeing to pay therefor $7.53 per hundred pounds. The Army Engineers had no weighing scales at their depot, and it was, therefore, agreed that appellants, as purchasers, would take the rope over to the weighing scales of the Southern Tin Compress Company in Memphis; that the rope would there be weighed by an official government weighmaster; that weight tickets certifying the actual weight of the rope would then be issued by the weighmaster; and that the weights so certified should be conclusive as to the actual weight of the rope and, accordingly, as to the amount of money to be paid to the government by appellants, Lazarov and Epstein.

The evidence discloses that appellants Lazarov and Epstein were partners operating the L. & E. Rag and Paper

Company, and it is the claim of the government that they caused the rope to be loaded in their trucks at the Engineers depot for transportation to the official weighing scales in Memphis, Tennessee; that, instead of taking the rope directly to the scales, they caused it to be taken first to their yard, where a substantial portion—an aggregate of 5,160 lbs.—was removed; that they then transported the balance to the scales where, consequently, only a portion of the rope loaded at the government depot was weighed and certified; and that appellants paid only for the amount of rope so weighed, thus defrauding the government out of that amount of the purchase price represented by the rope which appellants caused to be removed at their yard, before it was weighed.

Kimberling was the salvage officer of the Army Engineers at its depot in West Memphis. It was his duty to follow, in a government car, the trucks of the purchasers of material to be weighed—in this case, the trucks of appellants; to observe the weighing of the rope; and to certify to the weights from the official weight tickets, in order that the government should receive proper payments for the rope according to the actual weights. It is the further claim of the government that Kimberling conspired with appellants to defraud the government; that he knew of the removal of a quantity of rope at appellants' yard before it was weighed; and that he corruptly certified to the official weights, knowing that they did not correctly represent the amount of rope which appellants had received at the government depot. A reading of the complete transcript of the testimony indicates that the government was of the opinion that Kimberling was the key man in the conspiracy for the obvious reason that it considered that the claimed fraud could not have been carried out without his connivance.

Appellants claim that all of the rope was weighed first at the official scales; that thereafter, a certain amount of rope was removed from some of the trucks for the purpose of mixing it with an inferior grade of rope in order to get a better price for the batch; that appellants, after purchasing the rope from the government, sold it at an increase in price to A. Karchmer & Sons, of Memphis; that, after the rope was weighed, they transported it to Karchmer's place of business, where it was loaded into boxcars for shipment to Karchmer's customers in New York; and that they paid the government for all the rope they secured at the Engineers depot, and which they subsequently sold to Karchmer.

It appears that the Federal Bureau of Investigation first became interested in the matter when it received certain information as a result of an anonymous tip. For a considerable time before the sale at auction of the rope in question, the agents of the Bureau had been in close communication with the chief officer of the Army Engineers at West Memphis, Colonel Allen F. Clark, Jr. In fact, the first intimation received by Colonel Clark that anything was amiss, was at the time he was interviewed by the agents and was told that they had information that government property was being stolen from the depot. When Colonel Clark received this information, he immediately caused the Army Engineers to undertake an investigation of its own, and, at the same time, cooperated with the Bureau.

As a result of his investigation and the information received from the Federal Bureau of Investigation, Colonel Clark discharged Kimberling, who had served fourteen years with the Army Engineers as a civilian employee. But in spite of the charges against Kimberling and his indictment in the present case, and the insistence of the agents of the Federal Bureau of Investigation that he was the key man in the conspiracy to defraud the government, Colonel Clark, as he testified upon the trial of this case, stated that after many weeks of investigation, he came to the conclusion that Kimberling was innocent of the crime charged, and that he was to be blamed in the matter only because of his negligence, ap-

parently, on the ground that he did not follow appellants' trucks closely enough, or lost them in traffic between the government depot and the weighing scales, and improperly certified as to the weights. Kimberling himself, upon his discharge from the Army Engineers, demanded a hearing, in accordance with his rights under Civil Service, and appeared before the official board of investigation, at which time he gave an account of his actions, submitted to examination, and insisted not only that he was not guilty of conspiracy, but denied that he had been guilty of any negligence whatever in the matter. His discharge, however, was sustained, as has been said, on the ground of negligence. When the agents of the Federal Bureau of Investigation questioned Kimberling before the indictment had been returned, he told them, in answer to their advice to him, that he did not care to consult a lawyer before discussing the matter with them; and he forthwith gave them a voluntary statement, which was reduced to the form of an affidavit, and sworn to by him, in which he set forth the manner in which he had followed the trucks from the government depot to the weighing scales; and he therein declared that he knew that every one of the trucks had been weighed before any rope was removed at appellants' premises. As heretofore stated, the jury found that Kimberling was not guilty of the crime charged against him of conspiring to defraud the government.

The government's case against Lazarov and Epstein is based upon the testimony of John Rayford, a truck driver for appellants, as well as upon the testimony of several agents of the Federal Bureau of Investigation, and circumstances, which the government contends, prove the guilt of appellants.

Rayford, a temporary employee of appellants, testified that a quantity of the rope in question which he hauled from the government depot was removed from appellants' trucks before it was weighed at the scales of the Southern Tin Compress Company. He further testified that Epstein, who was at appellants' premises, instructed him, after such rope had been removed, to take the truck with the balance of the rope down to the scales of the Southern Tin Compress Company and have it weighed; and that he followed these instructions. If Rayford is to be believed, and if the jury believed him, the government proved its case on his evidence.

Rayford's testimony, however, is attacked by appellants on the ground that it is inconsistent, contradictory, and uncertain; and it is submitted that it is destitute of any probative value and that a verdict based thereon is not sustained by substantial evidence, which, as appellants correctly contend, must be competent, credible, and such that a reasonable mind might accept as adequate to support a conclusion.

One of the principal grounds upon which the credibility of Rayford is assailed is that his testimony is directly contrary to an affidavit which he made shortly after the event. It appears that two agents of the Federal Bureau of Investigation interviewed him a few days after the rope was transported from the government depot by appellants. Rayford repeatedly told the agents that none of the rope had been removed from the trucks before it had been weighed, but that a considerable quantity had been removed from some of the truck loads after it had been weighed, and before it was taken to the railroad boxcars for shipment by Karchmer. As a government witness, Rayford stated that one of the agents showed him his badge and told him to hold up his hand. He went on: "He swore me in, told me to hold up my hand—showed me a badge. * * * And he says, 'We are the FBI men.' And said, 'You don't have to make no statement,'—or something like that. * * * He said, 'But we was following the truck that you were driving,'—and he said, 'We want to know from you in your own words * * * What did you all do with that rope?' And I don't know what I told them. But he told me, * * * 'we know the truth, and we want you to tell

the truth. The truth is all we want about the thing. So far as you being concerned, you are not involved in it, and you are not concerned in it. * * * It doesn't make any difference with us, but we just want the truth. * * * Now, we know the truth, and come on, tell us the truth.' * * *. They told me I could go to jail if I did not tell the truth. * * * Well, he just kept on, and he told me that he was going to carry me down to some higher officers there." Rayford was asked on cross-examination whether the idea in taking him to some higher officers was because of the fact that he wouldn't tell the agents what they wanted him to tell them, and he replied: "I kept zigzagging. * * * after I found out there was something wrong with it—I didn't want to have nothing to do with it." Rayford, however, after his interview with the agents of the Federal Bureau of Investigation, signed a statement, witnessed by two of the agents, setting forth that an amount of rope was removed at appellants' premises before it was weighed at the scales. It was defense counsel who introduced this statement in evidence, and then introduced another affidavit that Rayford had signed a few days after the first affidavit. On this occasion, it appears, one of the counsel for defendants, accompanied by a court reporter, formerly an official court reporter for the Department of Justice, went to see Rayford at his home in the midst of his family. After a few minutes of discussion, the counsel asked Rayford a number of questions, which Rayford voluntarily answered. The questions and answers were taken down in shorthand by the court reporter, afterward transcribed by him in typewritten form, and signed and sworn to as the truth by Rayford. In this statement, Rayford set forth that he had told the government agents that the rope was thrown off the trucks at appellants' premises *after* it had been weighed at the scales. He further stated that this was the truth. He went on to declare in the second affidavit that the agent of the Federal Bureau of Investigation told him that they were just after

a statement from him; that they were going to lock him up because he wouldn't tell the truth; that they had seen what was happening; that they were going to put him in jail and that the higher officers might send him to the penitentiary if he did not tell the truth; that they knew what had happened and told him every street he had traveled in the truck with the rope from the government depot to appellants' premises; that they were telling him what had happened rather than his telling them; that in spite of his telling them that the rope had been thrown off the truck after it was weighed, which was the truth, they were telling him that that was not the truth. He further stated that he was scared about what would happen to him after their telling him about jail and the penitentiary.

As a witness for the government, Rayford testified that a week or so after he had been transporting the rope, he "wasn't sure" about the transaction; that, at that time, he did not know what he was doing—"I didn't know nothing about it"; that after the Federal Bureau of Investigation agents talked to him, he "began to study about it"; and that after three or four months, it came back very clearly to him; and that his memory of what he did with the rope was better in November, 1953, at the time of the trial, than it was nine months earlier at the time of the actual happening. There was no claim made that appellants or anyone else had asked Rayford to tell anyone anything different from the actual facts, at any time, or that there was any motive on his part or any inducement made to him to stand stubbornly, for a considerable time, on his first story—in spite of threats of jail and the penitentiary—that no rope had been removed before it was weighed at the scales. At that time, Rayford did not know anything about the transaction, or what charge was being made against appellants, or how they were, or might be, implicated. Nor was any reason shown why he should falsely make a long affidavit, in question and answer form,

swearing to the facts in the presence of the court reporter, directly contrary to his statement to the agents of the Federal Bureau of Investigation, as well as directly contrary to his testimony on the trial of this case. No one had approached him to do anything to favor appellants—and, in any event, he had no idea what effect his affidavit would have in the matter. The government does not claim that Rayford was trying to protect appellants or anyone else, when he first told the agents that the rope was removed from the trucks at appellants' premises only after it was weighed at the scales.

The least that can be said of Rayford's testimony is that he was afraid that he might go to jail unless he told the agents what they wanted to hear, regardless of the fact. Counsel for the government, in his closing argument to the jury, went out of his way to say that if they wanted "to just discount Rayford's testimony," there was plenty of other evidence to prove the guilt of the defendants. Standing alone, Rayford's evidence, because of its uncertainty and contradictions, would not sustain the verdict of the jury.

We come, then, to the evidence of the agents of the Federal Bureau of Investigation. These agents, for the most part, trailed the truck loads of rope from the time they left the government depot. Two government cars were used, with two agents in each car. One car would follow a certain distance, and then "go off surveillance"—a phrase often used to mean that they had lost track of the truck they were trailing in the crowded traffic. Frequently, it appears from the testimony, the agents in one car would communicate with those in the other car by radio, telling them they were dropping surveillance, while the others would then pick it up. This was done, it was stated, because of traffic difficulties, and in order to avoid being discovered. Most of this testimony is very unsatisfactory, as it is impossible to ascertain whether the government car coming on surveillance, when the other government car went off, actually picked up the trail of the trucks that were sought to be followed.

The agents in one government car, at such times, would not see the agents in the other government car. They would assume that the other car had picked up the trail, but the important questions whether that was actually done, and when, and where, are left, in most instances, to conjecture.

In one of the instances strongly relied upon to show the guilt of appellants, a government car with two agents followed a truck load of rope to appellants' premises, where it turned into the yard of the Rag and Paper Company, before going to the weighing scales. The government car passed by, and continued on for a distance of approximately 1,800 feet, where it turned right and proceeded past several streets for a distance of 1,500 feet, turned right again, and continued for another 1,500 feet along a street parallel to the street which appellants' premises faced. At a point 300 feet from appellants' yard, one of the agents got out of the car and advanced some distance to a location where he could see, through a wire fence, the truck load of rope in appellants' yard; and as he watched it, he saw a number of laborers throwing rope off the truck.

The government claims that this evidence is clear proof that the rope was removed at appellants' yard before it was weighed. However, the weighing scales were located only 1,500 feet from appellants' yard. After the truck had first stopped at the yard, it could have been driven to the scales, weighed within a few seconds, and driven back to the yard before the government car reached the point where the agent made his observation through the wire fence. The government car had to travel about 5,000 feet, while the truck, if it went from appellants' yard to the scales and back, traveled about 3,000 feet. Moreover, the government car had to cross at least three railroad tracks and a number of intersections on streets on which there was fairly heavy traffic; and it does not appear how long a period elapsed between the time the agent got out of the car and the time where he made his observations

of the unloading of the rope. There is unquestioned testimony that some of the truck loads of rope first stopped at appellants' yard for directions before proceeding to the scales and, as to at least three of those instances, the government does not claim that rope was removed before it was weighed. In brief, there was time for this particular truck load of rope, which was observed by the agent, to be driven to the scales, weighed, returned to the yard, and partially unloaded, before the government agent arrived at his place of observation; and the evidence that the rope was removed at the yard, at that time, is consistent with appellants' innocence, especially in view of the fact that appellants admitted having removed rope from three of the trucks—but only after it had been weighed. The evidence of the government agent's observation above mentioned does not sustain a verdict of guilt on the part of appellants.

There is, however, evidence that supports the government's charge that rope was removed from certain truck loads at appellants' yard before it was weighed by the government weighmaster at the scales of the Tin Compress Company.

It is agreed that altogether there were six truck loads of rope transported from the Army Engineers Depot by appellants' trucks—two on March 4, two on March 5, and two on March 6. There is no proof or claim made by the government that any rope was removed at appellants' yard on March 4; but it is claimed that rope was removed at appellants' yard before weighing from at least one of the truck loads on March 5, and from both of the truck loads on March 6. Appellants concede that rope was removed at their yard from three of the truck loads, but, as above mentioned, they claim it was removed after the weighing at the official scales.

Agent Dawson testified as to the two truck loads of rope which were transported from the government depot of the Army Engineers on March 6. He stated that both truck loads were driven to appellants' yard, where they turned in. He further testified that they afterward were driven to the Tin Compress Company; and that after they left the Compress Company, they did not return to appellants' premises. This is proof that the rope was not removed from these trucks after it was weighed at the government scales, and, consequently, if any rope had been removed therefrom, it must have been before it was weighed at the official scales. Agent Stanton testified that he and Dawson had followed the first truck load on March 6 from the Army Engineers to appellants' yard where it turned in. Stanton stated that he and Dawson then drove just north of the Tin Compress Company, where they waited; that after about ten minutes, they saw the same truck turn into the Compress Company to be weighed; that when the truck load of rope came out of the Compress Company's premises, they followed it from that point to the railroad boxcars, and saw that an appreciable amount of the rope was gone from the truck as compared with the load they had observed when it left the Engineers Depot. If any rope had been removed from the truck, it must have been removed at appellants' yard before weighing at the Compress Company, if Agent Stanton's testimony is believed, as, according to him, the rope was missing from the truck when he observed it immediately after it was weighed at the Compress Company; and it, obviously, was not removed at the place it was being weighed by the official government weighmaster. If any rope had been removed from these trucks, and they did not return from the scales to appellants' yard before proceeding to the railroad boxcars, the conclusion is inescapable that the rope was removed before weighing.

With respect to the other truck load of rope transported from the Army Engineers Depot on March 6, Agent Dawson testified that he and Agent Stanton had observed this second truck when it was crossing the bridge over the Mississippi after leaving the Army Engineers Depot; that they had then proceeded to a point north of the Tin Compress Compa-

ny to wait for the truck; that when he and Agent Stanton were notified that the other agents who were following the truck were leaving surveillance, he got out of the government car in which he and Stanton were waiting just north of the Compress Company, and proceeded on foot to a point on Seventh Street between the Compress Company and appellants' yard; that about 3:30 in the afternoon, he saw the second truck loaded with the rope come out of appellants' yard; that when it passed him on the way to the Compress Company, he noticed there was 25% less rope on the truck than when he had seen it at the bridge; that after the truck went into the Tin Compress Company to be weighed, he and Stanton followed it; that it did not return to appellants' yard, but continued directly on to Karchmer's where it was loaded into the boxcar. If the testimony of Dawson and Stanton is accepted, there is evidence to support a finding that a considerable amount of the rope was removed from the trucks at appellants' yard before it was weighed at the Compress Company. It is our conclusion that there was evidence to support a finding that the rope in question was removed under the direction of appellants who, as has been said, admitted giving such directions, but who insist that the rope was removed only after it was weighed at the government scales.

Moreover, it is admitted by Epstein and Lazarov that 5,160 lbs. of rope was removed from the trucks and deposited at their yard; and it is this particular batch of rope upon which the whole case before us depends. They, however, claimed that the reason that this rope was removed at their yard after it was weighed in the trucks at the official scales was in order to mix it with some rope of an inferior grade, which they had on hand, so that they could get a higher price for the mixed batch than if they had sold this portion of government rope and the inferior rope separately. The rope which was removed from the trucks at appellants' yard, however, was never mixed with the inferior rope. Appel-

lants' explanation why the plan to mix the rope was not carried out is that on the last day of deliveries of the rope by appellants to Karchmer, and after the six truck loads had been delivered to him, Lazarov drove down to Karchmer's place of business where the rope was being loaded into boxcars, and casually remarked to Karchmer that a quantity of the government rope which they were selling him was being mixed with inferior rope at appellants' yard in order that appellants could "get by" with a higher price for the poor rope. Karchmer, who was a witness for appellants, testified that he then told Lazarov that he was selling the rope "on consumer's report," which meant that Karchmer's purchasers could reject the shipment if all the rope did not correspond to the grade sold, and that; in such an event, Karchmer would be obliged to hold appellants for any resulting loss. Karchmer went on to testify that Lazarov, on being told of this situation, gave up the idea of mixing the rope, and called his office by telephone, giving directions, in Karchmer's presence, to someone in the office, not to mix the inferior rope, but to load and send down the good rope at once; that shortly thereafter, a small pick-up truck arrived at Karchmer's with "a piece of a load"; that, at that time, the driver of appellants' pick-up truck handed Karchmer a weight ticket for the rope showing that it had been weighed, not by the government weighmaster at the official scales, but by someone using the scales located at appellants' yard; that such weight ticket showed the batch to weigh 5,160 lbs.; and that this batch of rope was thereupon loaded in one of the boxcars for shipment by Karchmer with the other rope that had previously been delivered by appellants. The weight ticket in question was a printed form with the heading of Lazarov Bros. Steel Company, addressed, in handwriting, to A. Karchmer & Son, showing the gross weight, the tare weight, and the net weight of 5,160 lbs.

Karchmer further testified that, by giving a credit, he paid appellants for

55,000 lbs. of rope,[1] which was the total shown by the official government weight tickets; that he paid no attention to appellants' weight ticket of 5,160 lbs.; and that this latter amount was not added to the aggregate government weight of 55,000 lbs. upon which he paid appellants.

Karchmer stated that he had agreed to pay appellants $7.75 per hundred pounds for rope which appellants purchased from the government. But Karchmer did not weigh the rope as he received it from appellants, or at any other time. He testified that he had agreed to accept the government weights on the rope, and to pay appellants for the same weights upon which appellants paid the government, without even seeing the government weight tickets. It was these government weights, as has been said, that totaled 55,000 lbs.

From the foregoing circumstances— the weighing of the 5,160 lbs. of rope at appellants' yard, and the sending of appellants' personal weight ticket therefor to Karchmer; the claim that the rope was removed from the trucks to be mixed with inferior rope; the agreement between Karchmer and appellants that Karchmer was to pay appellants for his purchase of the rope from them, solely on the basis of the official government weights—it not only appears that appellants' defense is inconsistent with the facts, but that the circumstances strongly tend to support the government's claim that the rope in question was removed from the trucks before it was weighed at the government scales, and that there was, therefore, sufficient evidence to support the jury's finding that appellants were guilty of the offense charged. For the government, as mentioned above, claimed that appellants had engaged in a swindle by securing the 5,160 lbs. of rope from the government, without paying for it, and, thereafter, selling it to Karchmer.

In this regard, it is to be emphasized that Karchmer claimed that the agreement between him and appellants was that he was to pay them solely on the basis of the government weight tickets and, in this, his testimony was undisputed. If the 5,160 lbs. of rope had been weighed at the government scales before it was removed at appellants' yard, there would have been no need to weigh it again at appellants' yard, and no need to send appellants' personal weight ticket down by the truck driver, with the load, to Karchmer.

Without any reasonable explanation, or any explanation whatever, forthcoming, the jury was justified in believing that the 5,160 lbs. had not been previously weighed at the government scales; that it had been removed at appellants' yard from various truck loads before they were weighed at the government scales; and that this batch of rope was sold—on appellants' own weight ticket— to Karchmer, in addition to the other government rope which had been weighed at the official scales. If this were the case, obviously appellants would not have paid the government for the rope as they paid only according to the official government weight tickets; and this batch would not, under the inferences that could reasonably be drawn by the jury, have been included in the weights shown upon the official weight tickets on which appellants paid the government; and, therefore, obviously, the government would have been swindled out of the price for 5,160 lbs. of rope.

With regard to the claim that the 5,160 lbs. of rope had first been weighed at the official scales and then removed from the trucks at appellants' yard in order to mix it with inferior rope and get a higher price, this contention falls too because of inherent contradiction. For the natural questions arise: If Karchmer was to pay appellants solely according to the weights on which ap-

---

1. Two hundred and ten pounds had been deducted by agreement between appellants and Karchmer because cork bump-ers of no value had been included in the aggregate weights.

pellants paid the government, how could anyone have known how much inferior rope had been mixed with the government rope? How could appellants get a higher price from Karchmer from the mixed rope if Karchmer was to pay only official government weights for the rope sold by appellants? Karchmer was not weighing any of the rope; and there was no understanding that appellants were to weigh any of the rope. The government was to be paid on the official weights, and appellants were likewise to be paid by Karchmer according to the official weights. How, then, were appellants to secure any price at all for the inferior rope? How could they have charged Karchmer anything for such inferior rope when they would not know how much was in the batch; and how could they tell how much inferior rope was mixed with that part of the government rope which had been removed at their yard, when they did not know either the weight of the inferior rope or of the government rope they had removed? If Karchmer was to pay appellants solely on government weights, there could have been no plan to mix a lot of inferior rope with the government rope to get a higher price for the batch; and if there was no plan to mix the 5,160 lbs. of government rope with the inferior rope, there was no honest reason advanced for having removed the government rope at appellants' yard. Appellants' explanations are inconsistent with the truth. If there were any truthful explanations, they were not given. In the light of the above circumstances, and in view of the testimony of Agents Dawson and Stanton, heretofore discussed, the jury was justified in concluding that the 5,160 lbs. of rope had been removed at appellants' yard before being weighed at the government scales, and that appellants had never paid the government for such rope, and never intended to.

In this regard, it also appears from the evidence that Agent Stanton, of the Federal Bureau of Investigation, interviewed Karchmer in the course of his investigation, and, on the trial, testified that Karchmer told him that the 5,160 lbs. of rope delivered to him was in addition to the 55,000 lbs. he had already received. The aggregate weight of the rope, according to the official government weight tickets, was, as mentioned above, 55,000 lbs. Accordingly, the foregoing testimony of Stanton constituted evidence that sustained the government's claim that the 5,160 lbs. had never been weighed at the official scales, although it was admitted by appellants that this was rope which had been received by them from the Army Engineers at the government depot. It is to be said that Karchmer strongly disputed having told Stanton that the 5,160 lbs. of rope which he had received was in addition to the 55,000 lbs. that had theretofore been delivered; but the credibility of the testimony was for the jury.

█ As to the proof of conspiracy, it appeared that, as mentioned above, Lazarov and Epstein were partners; that they both knew of the purchase of the rope from the government and of the sale to Karchmer. The evidence further discloses that Epstein was present, giving instructions and supervising the unloading of the rope at appellants' premises; that Lazarov was at Karchmer's premises at the time the last delivery truck arrived there, and, at that time, informed Karchmer that the balance of the government rope was at appellants' premises; that Lazarov also gave the instructions to appellants' office to send the balance of the rope, which had been removed at the yard, down to Karchmer. A conspiracy may be established by circumstances; and if the jury believed that the rope in question was removed at appellants' yard before it was weighed by the government weighmaster, the foregoing circumstantial evidence was sufficient to warrant the drawing of inferences that both appellants were engaged in the transaction of removing the rope before it was weighed, and in the conspiracy charged. The fact that Kimberling was acquitted of the charge of conspiracy is of no avail on appeal to Epstein and Lazarov and does not affect

the verdict as to them. Baxter v. United States, 6 Cir., 45 F.2d 487; United States v. Austin-Bagley Corp., 2 Cir., 31 F.2d 229.

Appellants contend that the district court committed reversible error in charging the jury, as follows: "It is * * * incumbent upon the Government, before you can convict the defendants, to establish to your satisfaction beyond a reasonable doubt that the crime, or crimes, charged in the indictment, and every constituent element thereof, have been committed; that the same was committed within the Western Judicial District of Tennessee, the Western Division, before the finding of this indictment. And there is not any question about that. The Court instructs you as a matter of law that it did happen in this particular division of the Court. And that the defendants at the bar committed the crime, or crimes, in such manner as would make them guilty under the law heretofore defined and explained to you."

The foregoing, appellants' counsel contend, was equivalent to a directed verdict of guilty, as they argue that the pertinent portion of the above charge read, in effect: "The court instructs you as a matter of law that the defendants at the bar committed the crime or crimes in such manner as would make them guilty."

On the other hand, the government submits that the charge consisted of a proper statement of the law; that the court was instructing the jury as to where the crime was committed and interpolated: " * * * And there is not any question about that. The Court instructs you as a matter of law that it did happen in this particular division of the Court * * *," and then resumed his formal instruction to the effect that the government was obliged to establish to the jury's satisfaction, beyond a reasonable doubt, "that the defendants at the bar committed the crime, or crimes, in such manner as would make them guilty under the law."

No exception was taken to the instruction but, of course, an appellate court will consider an error in the charge which is seriously prejudicial or amounts to a grave miscarriage of justice even though no objection was made in the trial court. The government's interpretation of the instruction is completely persuasive and in keeping with the entire charge as to the presumption of innocence, as well as the government's burden of proving appellants' guilt beyond a reasonable doubt.

On the question of claimed prejudicial argument by the district attorney, it appears that it was called forth by arguments of counsel for appellants, and was in answer thereto.

As to other claims of error that the district court failed to give requested instructions, it appears that they were covered in the general charge.

In accordance wth the foregoing, the judgment of the district court is affirmed.