**Raymond PERCIFIELD, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 15119.

United States Court of Appeals
Ninth Circuit.

Feb. 14, 1957.

**226**

Maurice J. Hindin, Los Angeles, Cal., for appellant.

Charles K. Rice, Asst. Atty. Gen., Franklin Rittenhouse, U. S. Atty., Las Vegas, Nev., and Stanley H. Brown, Asst. U. S. Atty., Reno, Nev., Clyde R. Maxwell, Jr., Asst. Reg. Counsel, San Francisco, Cal., for appellee.

Before HEALY, POPE, and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

Convicted by a jury on each of two counts charging income tax evasion, appellant appeals from the judgment sentence pronounced thereon.

The first count in the amended information upon which the trial was had charged appellant with attempting to evade and defeat income tax owed by him and his wife for the year 1948 by means of filing false and fraudulent income tax returns that understated their income tax in the amount of $2,041.92. The second count charged that he willfully and knowingly attempted to evade and defeat the income tax owed by him for the year 1949 by means of filing a false and fraudulent return which understated his income tax in the amount of $559.76.

During the years in question appellant operated a gambling casino at Rangely, Colorado, known as the Ace-High Club. This contained a bar, a lounge, a cafe, and a casino room where games of chance were played, including blackjack or "21", poker, craps or dice, as well as slot machines. This Club had been purchased by the appellant in October, 1947, for $70,000, which included $3,500 worth of inventory. Appellant also owned another gambling place named Nevada Club at Wendover, Nevada.

The government claimed that during the two years involved he supplemented his income by "running games" in Colorado, Wyoming, Montana, Nevada and Utah, in which States he admitted "taking part in games".

Two income tax returns were filed at Reno, Nevada, by appellant for the year 1948, one purporting to report income from the Ace-High Club and the other, income from the Nevada Club.

James W. Bell, a special agent of the Intelligence Unit of the Internal Revenue Service, and Michael E. Thomas, Internal Revenue Agent, were assigned to investigate the tax liabilities of appellant. They interviewed him on September 30, 1952, after placing him under oath. A preliminary investigation revealed that the Glenwood Savings Bank held for collection a promissory note for $55,000 executed by Percifield in part payment for the purchase from one Joe Rosa of the Ace-High Club in October, 1947, for $70,000. Principal payments in the amount of $32,880 had been made on the note during the years 1948, 1949 and 1950. He had told Bell and Thomas that his living expenses totaled about three thousand dollars a year, that he had received no non-reportable income. It was pointed out to him that there were "some $36,000 of monies, of receipts, that had to come from some source," and I [Bell] asked him where it came from. He said, "I told you that I gambled, but I didn't know that it was that much." He said, "I have taken part in games in Colorado, Wyoming, Montana, Nevada and Utah." He said, "I even left this place for two or three weeks at a time. I have taken part in

dice, twenty-one, mostly poker games." He also admitted that he had not kept a record of his gambling income.

Eleanor Jones, a witness for the government, had performed bookkeeping work for Percifield during the period between the "latter part of '47 until about the middle part of '49". Her duties were to "keep the daily records and expenditures and I would summarize and give a monthly total", "that wouldn't be the basic records for the business, but rather the secondary records".

She stated that at the commencement of her employment "I asked him to keep a record of receipts and then wrote it down receipts from bar, from the cafe, and lounge. It had to be separated because of sales tax returns, excise tax returns". Also, "I asked him to report any cash paid out he might have and checks he wrote and make notation of them, what they were for, on the check stub; to [sic] what type of expenditure it was for and any other income he had. * * * If he had gambling income, I stated [sic] to keep records". When asked whether "He gave you records?", she replied, "I don't think he put it down. He didn't want to show it on the monthly summary." Further, that he did not comply with her request that he "keep a running cash balance on hand"; and that he did not keep a record of his gambling that she saw.

Mrs. Jones made monthly summary records for appellant for the Ace-High Club for a portion of the year 1947 and the years 1948 and 1949 from daily records furnished by him; these daily records did not include gambling income because "he did not want to show it on his monthly summary". She did not prepare either of the 1948 returns, but she "probably made yearly total of all receipts and expenses, so far as bar, cafe and lounge". It contained no information as to gambling receipts or losses, because he had withheld that information.

She stated that she did prepare the 1949 return from the summary records for the Ace-High Club and from the Nevada Club records. The latter records were given to her by appellant at the time she prepared the return. At that time she asked him if he had any other income. He replied "That he had no other income or losses that should go on his return". She further testified that she knew she had no record of gambling receipts from the Ace-High Club.

Appellant attacks an instruction given by the court on reasonable doubt as inadequate.[1]

Appellant has not complied with Rule 18 of this Court.[2]

Furthermore, no objection was voiced by appellant at the conclusion of the charge, though the judge afforded him an opportunity to do so in the absence of the jury. The Rule precluding a party from assigning as error on appeal any instruction or omission therefrom, unless objection was made thereto before the jury retired to deliberate and unless he stated at the trial distinctly what he objected to and the grounds of the objection, has a well-known and salutary purpose. When observed it affords the trial judge an opportunity to correct any error,[3] thus according a defendant a fair trial and eliminating from the case an error that would be otherwise available

---

1. "A reasonable doubt is one based on reason. It is not mere possible doubt, but it is such doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charges in a count of the information, there is not a reasonable doubt as to such count. Doubt to be reasonable must be actual and

substantial, not merely possibility or speculation."

2. Rule 18, subd. 2(d), 28 U.S.C.A. "* * * When the error alleged is to the charge of the court, the specification shall set out the part referred to totidem verbis, whether it be in instructions given or in instructions refused, together with the grounds of the objections urged at the trial."

3. We pertinently observed in Herzog v. U.

on appeal in case of a verdict adverse to the defendant.

■ Although admitting that he failed to comply with Rule 18, appellant asks that we apply Rule 52(b), Fed.Rules Crim.Proc. 18 U.S.C.A., under which we may notice plain error affecting substantial rights though it was not called to the attention of the court. This we decline to do for two reasons: 1. The error in the instruction, if any, is not a plain error. "Plain" means "clearly or plainly apparent" and in this sense it has been stated that what is plain can be seen at the first glance without search or study.[4] The space devoted in the briefs and the time devoted on oral argument relating to this instruction by respective counsel in condemning and defending it would indicate that the asserted error is anything but plain.[5] It is quite arguable that the instruction is proper. 2. As stated by Judge McAllister in Lazarov v. United States, 6 Cir., 1955, 225 F. 2d 319, 329, quoted approvingly in the Herzog case, supra, "of course, an appellate court will consider an error in the charge which is seriously prejudicial or amounts to a grave miscarriage of justice even though no objection was made in the trial court." The evidence in the case does not permit the conclusion that the asserted error was seriously prejudicial or that there has been a miscarriage of justice. Cf. Herzog case.

Appellant next attacks instructions given on the net worth method. The instructions given and refused on the subject are not set forth in full in appellant's brief. A general objection was made at the trial but appellant did not specify the grounds of his objections.

The giving and the failure to give other instructions relating to the testimony of character witnesses, cautionary instructions, the net worth method, and "adequacy of the defendant's books": In no instance has appellant complied with our Rule 18. In Gordon v. United States, 9 Cir., 202 F.2d 596 we held that we need not consider a specified error where appellant failed to set out instructions given or requested in *totidem verbis* and the grounds if any, of the objections thereto. Further, even if Rule 18, subd. 2(d) had been complied with in no instance is the alleged error of such a nature that a miscarriage of justice would have resulted therefrom.

The defendant did not take the stand. He contented himself by producing several witnesses who testified to his good reputation generally but as to no particular trait. His character might have been good as to certain traits but not as to his being law-abiding. It is questionable that witnesses would have intended to testify favorably as to that trait, in view of his well-known illegal activities in gambling.

■ Once the government has established its case, the defendant remains quiet at his peril. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.

S., 9 Cir., 235 F.2d 664, 667: "This court has not gone overboard in its application of Rule 52(b) to situations such as here presented, and it does not propose to do so now. In the great bulk of the cases in which counsel have sought to have us consider claims of error in instructions not objected to at the trial we have declined to do so. More than once we have stressed the salutary nature of Rule 30 and the vitally important part it plays in the administration of justice. Thus in Enriquez v. United States, 9 Cir., 188 F.2d 313, at page 316, we remarked that Rule 30 'is not designed as a mere trap for the unwary. Painstaking compliance with its requirements, although not an easy matter for the lawyer,

is of the very essence of the orderly administration of criminal justice.' But, in common with the generality of the circuits, we recognize that the Rule *does not* debar us from noticing of our own motion error in instructions thought to have resulted in a *miscarriage of justice*."

4. 70 C.J.S., p. 1098.

5. This court in Crutchfield v. United States, 9 Cir., 1943, 142 F.2d 170, 176, stated "If the error is of such a nature that the sentence could be successfully attacked collaterally, as in habeas corpus proceedings, then the error is plain and should be noticed by this court, * *." The errors claimed in this case do not meet this test.

Ed. 150, comparing Yee Hem v. United States, 268 U.S. 178, 185, 45 S.Ct. 470, 69 L.Ed. 904.

■ Error is attempted to be predicated upon the court's failure to give an instruction upon the effect of character evidence offered by appellant. These so-called character witnesses testified to Percifield's general reputation, rather than to his character and so an instruction as to the effect of character evidence was not warranted.[6]

■ An affidavit executed by Percifield was received over objection. This is claimed to be prejudicial error. Following the interview which Bell and Thomas had with Percifield, detailed above, and on October 1, 1952, Bell met Percifield in the office of Mr. Balcome, appellant's lawyer, and there Percifield signed an affidavit which had been dictated by Balcome. Therein he stated:

"1. During the calendar years 1948, 1949 and 1950 he neglected to show all income on income tax returns, form 1040, and attached schedules thereto, and that during those years he received personal income in excess of $36,000.00, part of which additional income is reflected by payments on one certain promissory note given by this affiant as part of the purchase price of the Ace High Bar and Cafe.

"2. That the additional income which was not reported during those three years was obtained from gambling in the States of Colorado, Utah, Wyoming, Montana and Nevada."

Appellant makes the specious argument that, since he was not charged with tax evasion for the year 1950 and there was no allocation or segregation of the reported lump sum income during the three years, there is no probative value "to prove non-reported income for the years 1948 and 1949". It did, however, constitute an admission of unreported income from gambling for these years. The statements in the affidavit are corroborative of Eleanor Jones' highly damaging testimony and other evidence which we have mentioned.

■ But it is contended that the *corpus delicti* had not been established. This claim is too tenuous to call for comment. Let it be sufficient to remind appellant that there was proof that he had deliberately failed to report his individual gambling receipts and his receipts from his casino gambling operations. His assets had increased and his liabilities had decreased during the two years, greatly beyond what could be accounted for from the reported income. His bank deposits were greatly in excess of receipts shown in the summary records. The affidavit was clearly admissible.

■ The government resorted to the net worth method and the deposit and expenditure method in proving its case.[7]

6. Kreiner v. U. S., 2 Cir., 11 F.2d 722, certiorari denied 271 U.S. 688, 46 S.Ct. 639, 70 L.Ed. 1152.

7. Forrest P. Calkins, Technical Adviser in the Income Tax Service, an expert in accounting, described the deposit and expenditure method as follows:

"It is a reconstruction of the taxpayer's financial transactions, either running through his bank account or cash money that is expended during the year. We first take the total bank deposits. We subtract from them any deposits that were not of an income nature; that is, loans made from private parties, and deposited in the bank account and that is placed in non-taxable income. We add to that known cash expenditures that would not be reflected properly in the bank deposits. That would give us the gross income. From that we would subtract deductible expenses made during the period of the year, such as analysis of deposits account or cancelled checks, depreciation, his business expenses, personal expenses, although we would keep the business and personal expenditures separate. We would take the cash outlay expenses, or the checks written and paid and to that we would add what we refer to as known cash item expense, such as depreciation. We would have adjusted gross income, which in simplest form is the taxpayer's evidence of income. From that we would deduct the withdrawals of a more personal nature, as personal deduction, trips and payments on personal obligations, taxes paid, auto licenses, and taxable items of that nature,

The corrected income under these two methods came to substantially the same amounts. Appellant attacks the instructions given concerning these two methods and the court's failure to give instructions which he proposed. Particularly, he points out that the jury was not clearly instructed that all increases in net worth do not constitute taxable income. We think this was sufficiently covered by the instructions that were given and, furthermore, that under the bank deposits and cash expenditures method, it was unnecessary for the jury to determine the net worth in ascertaining whether there was unreported income.

Since there is no reversible error, the judgment is

Affirmed.

medical expenses as a personal deduction, to arrive at net income, or if those personal deductions do not total what the government allows as standard deductions, which is there computed on the tax table on the back of the tax returns for adjusted gross income of five thousand dollars or less [sic] was 10 per cent of your net income or adjusted gross income, limited to one thousand dollars, taking either the standard deductions or items deduction, whichever is higher, we arrive at the net income for tax purposes."