Herman D. HOLT, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16506.

United States Court of Appeals
Ninth Circuit.

Nov. 5, 1959.

Seaman, Dick & Roberts, John Cooley, Stockton, Cal., for appellant.

Lynn J. Gillard, U. S. Atty., Bernard Petrie, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before POPE, CHAMBERS and HAMLIN, Circuit Judges.

POPE, Circuit Judge.

The appellant Holt was found guilty upon each of three counts of an indictment charging him with willfully and knowingly attempting to evade and defeat income tax owing by him to the United States by filing and causing to be filed false and fraudulent income tax returns in which he knowingly understated his income for each of the three years covered by the separate counts of the indictment, namely, 1952, 1953 and 1954.[1] After the verdict of guilty, appellant was sentenced to three months imprisonment on each of the three counts, the sentences to run concurrently, and he was ordered to pay the costs of the prosecution. This appeal followed.

The evidence showed that about the year 1950, Holt, who operated a small automobile repair shop or garage at Ceres, California, began experimenting with a mast designed to hold a television antenna. As a result of that he developed what he called the "Jiffy Mast", ultimately patented by him, and which he proceeded to manufacture and sell for use in connection with television aerials. The device proved to be successful and very popular and his sales became numerous and substantial and his profits multiplied rapidly. He carried on this increasingly profitable business throughout the years here in controversy. Substantially all of the work of producing the masts was done by Holt, his wife and his son. The son was attending school during that period but assisted in the hours after school. Mrs. Holt kept such books of account as they had and made substantially all of the entries therein. It was from these books that Holt took the figures in making up his income tax returns.

While the report of the gross income made in Holt's returns for the years in question was taken from the books of account kept by Mrs. Holt and substantially conformed to figures there shown, yet the evidence disclosed, without contradiction, that the books themselves failed to reflect all of the income. The income actually received in the business was substantially greater than the income reflected in the books or shown on the returns.

The Government's proof disclosed that in the year 1952, Holt received payments for purchases of his product amounting to $25,936.32 represented by some 90 payments from customers, none of which was entered in the books or reflected in the tax returns for that year. In the year 1953, the sum of $17,568.29 was received from sales through some 75 payments, none of which was entered in the books or reflected in the tax return for that year. For the year 1954 there were some 46 purchases which were not recorded in the books. These aggregated

approximately $9000, none of which was reflected in the tax return for that year.[2]

■ In addition to the type of evidence just referred to, the Government undertook to reconstruct the net income for the years in question by the net worth plus personal expenditures method. It is sufficient to say that the proof of the opening net worth for each of these periods was definite and sufficient. The proof was adequate to eliminate from the calculations all sums attributable to nontaxable receipts. The personal expenditures in the years in question were added to the yearly net worth increase to establish the reconstructed gross income. Depreciation allowable was calculated and deducted; and the standard deduction was applied and the reconstructed net worth determined.

All this proof adequately satisfied the standards set forth in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L. Ed. 150. It showed an understatement of net income for the year 1952 of $18,431.04, in 1953 of $13,583.24, and in 1954 of $11,212.11.

The Government's proof of understatement of income was not controverted. Appellant's brief concedes that the testimony showed that there were 211 items of unrecorded sales receipts. When compared with the total items of such receipts, the record shows that one out of every six sales was not recorded in the books; hence, one-sixth of the total number of sales was not reflected in the returns.

■ Although appellant contends and undertakes to argue that the court should have granted appellant's motion for acquittal, and that the verdict is not supported by substantial evidence because of lack of proof of an intent to defraud the Government, we think such contention is without merit, and that the evidence was clearly sufficient to warrant the jury's determination of a specific intent to defraud;—that there was willfulness on the part of the defendant in understating his income.

It is true that prior to the time when appellant made his invention and the business began to prosper he had little business experience which called for accounting or the keeping of records. However, the records here were very simple ones; a journal was kept in which the Holts purported to enter all receipts from sales, but the great number of omissions which occurred, the very substantial amounts of sales which did not appear in the books were so great, that it is plain the jury could properly infer from the very size of these omissions and the large number of the items that the understatement was a willful one.

Thus for the year 1952, the reconstructed net income shown by the net worth calculations was $25,160.56; the net income returned was $6,729.52. The understatement for that year was $18,431.04. There were 208 entries of sales in the books while 90 other items of sales were omitted; thus 30% of all sales for that year were omitted. It was for the jury to say whether the omissions were due to mistake, carelessness, inadvertence or willfulness.

The situation presented here is not substantially different from that presented in Holland v. United States, supra, where the court discussed this aspect of the case as follows: (348 U.S. at page 139, 75 S.Ct. at page 137) "A final element necessary for conviction is willfulness. The petitioners contend that willfulness 'involves a specific intent which must be proven by independent evidence and which cannot be inferred from the

2. A portion of the payments for purchases which were not recorded in the books were shown by calling witnesses who had made the purchases and who identified their checks given in such payment; other additional items were picked up by the investigating officers through an examination of the bank deposits. Thus in respect to 1952, witnesses identified checks paid by them for 17 sales aggregating $16,162.66. The examining special agents found additional items for that year aggregating $9773.66. The aggregate was thus $25,936.32, the amount of gross receipts not shown in the books.

mere understatement of income.' This is a fair statement of the rule. Here, however, there was evidence of a consistent pattern of underreporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records. Since, on proper submission, the jury could have found that these acts supported an inference of willfulness, their verdict must stand."

There was other evidence indicating purposeful concealment. In a substantial number of instances when checks were received and sales made, the entries made in the books were for only portions of the checks. Thus in one such instance where a check for $315 was received, the entry in the books was for just one-half that amount or $157.50. Things like that can hardly be explained as inadvertence or as negligent failure to make an entry.[3]

Again, for some several months in 1954, Holt carried on a side venture in which he, his wife, and his wife's sister and husband, L. B. Dohoney, were interested. Although Holt took credit in his return for the expenses incurred in connection with the Dohoney joint venture, the proceeds of the sales made through that venture were not included. Holt claims that this was due to the fact that Dohoney handled these deals, but it is difficult to explain how Holt managed to include over $3000 in expenses incident to the Dohoney deal and wholly omit the receipts therefrom.

Holt himself took the stand. His counsel described a portion of his testimony as follows: "Appellant failed miserably in explaining, when requested, why the sales were not included in his records or how the failure to record such sales occurred." If anything, that is an under-statement. Holt in his testimony undertook to explain how it happened that many checks received were not entered in the books by saying: "I usually grabbed at the checks and ran to the bank to cover a purchase that we were making. * * * When we had to buy a big load of pipe and the man was coming with the pipe, he had to have the money right then, he wanted to take a check with him showing he delivered the pipe, well, sometimes I would dash over there with all these extra checks in my hand so that we could cover it." "I know that when there were checks in there and I was low on money and I had to get this material bought, then is when I would grab the money and run over and get it in the bank." "I usually just trotted over there and put them in the bank because I was always afraid of being overdrawn."

On cross-examination Holt was asked how he knew that he needed to get funds in the bank to meet outstanding checks and he replied: "We was never sure." But as the cross-examination proceeded it developed that on these occasions when, according to Holt's explanation, he was afraid of an overdraft, his balance in the bank ranged all the way from $10,000 to $28,000. In short, the jury would be justified in concluding that Holt was concocting that story and fabricating an account of how it happened that the entries were omitted. If it was apparent that defendant was making false statements in the case, then the jury could take such statements into consideration in weighing the question of Holt's guilt and his guilty knowledge.

The settled rule in such cases is stated in Wilson v. United States, 162 U.S. 613, 620, 16 S.Ct. 895, 898, 40 L.Ed. 1090: "Nor can there be any question

---

**3.** There was evidence from which the jury could conclude that a certain check for $1500 received for sales was entered in the book as $150 and another similar check for $1950 was entered in the book for $195, and that when the tax returns were made these items were added in to the totals which went on the returns as $150 and $195 respectively. At the time of the trial, these two entries showed up as $1500 and $1950 respectively, but the manner in which the last ciphers were placed on the book were such that the jury could believe that the entries had subsequently been altered.

that, if the jury were satisfied from the evidence that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right, not only to take such statements into consideration, in connection with all the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense, made or procured to be made as in themselves tending to show guilt." [4] The evidence of guilt here we think was ample and abundant.

After his arraignment and plea, appellant filed a motion for a bill of particulars of the charges against him. That motion was denied. Thereafter he filed a motion for discovery and inspection. At the time of the argument of the motion for a bill of particulars counsel for Government stated to the court and to counsel for the defense the general nature of the proof to be offered by the Government as follows: "Its basic proof is going to be the net worth-plus-the-expenditures method of proof and we will corroborate that by showing specific sales made by these defendants in the regular course of business that did not go into the books." The court while denying the motion, ordered that the Government disclose to the defendants the opening and closing net worth amounts for each of the years set forth in the indictment and the several counts thereof, citing United States v. King, D.C., 16 F.R.D. 124, as authority for the order. The order was complied with.[5] Appellant then filed his motion for discovery and inspection and for a continuance to allow additional time for a preparation of his defense.[6] After an extended hearing and testimony taken during which it was agreed to furnish defendant with a transcript of a statement taken from accountant Newell, the motion for discovery and inspection was denied.

■ The rule is of course that the granting or denial of a bill of particulars is generally a matter within the sound discretion of the trial court.[7] Appel-

4. The jury may also have concluded that some of Holt's testimony relating to a partnership with his son, mentioned later in this opinion, was untrue, and from that also they may have drawn an inference of guilt under the rule here mentioned. For a general discussion of the rule stated in Wilson v. United States, supra, see Wigmore on Evidence, 3d Ed., § 278. The rule was recognized, though not applied, in Wong v. Swier, 9 Cir., 267 F.2d 749, 759.

5. The files show an acknowledgment of receipt by counsel for the defense of the stated net worth amounts and receipt also of the claimed personal "non-deductible" expenditures for each of the years involved. It also shows an acknowledgment of receipt of a transcript of the statement of the accountant Newell, hereafter referred to. These acknowledgments were filed April 13, 1959.

6. His showing was that defendants were indicted February 6, 1959; that his motion for a bill of particulars had been filed but not argued until March 17, 1959, and the order thereon entered March 24, 1959. It was requested that Government counsel permit appellant to inspect a copy of the sales tax returns made to the State of California by the defendants, various bank accounts in stated banks, bank account statements or abstracts thereof, the audit working papers, schedules, notes, reports, abstracts, and lists taken from the defendants by the revenue agents, the revenue agents' report and transcript of a statement taken from appellant, and transcripts of statements taken from Dohoney; copies or abstracts or lists of all accounts maintained by customers or business associates of the defendants; all schedules, lists, reports and papers prepared by a special intelligence agent from information taken from the defendant's financial records and from conversation with the defendants; a transcript of a statement taken from one Jack Newell, an accountant of the defendants on or about November 28, 1956; work sheets, abstracts or lists showing items on the net worth statement including cash in banks, personal expenditures and home purchase.

7. "The granting or denial of a bill of particulars is in the sound discretion of the trial court and if no abuse or prejudice appears its action in denying the application will not be disturbed on appeal." Maxfield v. United States, 9 Cir., 152 F.

lant's claim of error in respect to the denial of the motion for discovery and inspection is based upon the provisions of Rule 16 of the F.R.Crim.P., 18 U.S. C.A., which authorizes a court to order Government counsel to permit the defendant to inspect and keep books, papers or documents "obtained from or belonging to the defendant or obtained from others by seizure or by process," and a showing that the request is reasonable. Here none of the matters sought were obtained by seizure or by process and there was no showing that the books, papers and documents belonging to the defendants were not fully available to the appellant who continued to have access to them.

We are of the opinion that there was no abuse of discretion on the part of the trial court in denying the motions for a bill of particulars and for discovery and inspection. The evidence shows that the special agent investigating these tax returns continually consulted the appellant and sought from him explanations of the various items of evidence tending to show understatement in the tax returns. All this time appellant necessarily knew what the agents found and what required explanation. There was no reason to infer that the defense lacked adequate means and information for preparation for trial. The fact of the understatement of income was established so conclusively, the circumstances of the failure to keep records of income were so completely unexplainable, that no amount of particulars and no quantity of notes, memoranda, or other papers compiled by the agents and sought by these motions could have been of the slightest assistance to the appellant. Because on this point the Government's case was overwhelming, there could be no error in refusing these reports to appellant. United States v. Sheba Bracelets, 2 Cir., 248 F. 2d 134, 145.

The circumstances here are markedly different from those which appear in Ginsberg v. United States, 5 Cir., 257 F.2d 950, 955, a case upon which appellant has relied. In that case the defendant had sought bills of particulars and had made motions for discovery. These were denied. After the books and records on which the Government relied had been placed in evidence, the defendant took them and placed them in the hands of accountants for analysis. Their analysis had not been completed before the jury returned its verdict. Thereupon the appellant moved for a new trial, and attached to the motion the auditor's report containing information calculated to discount considerably the evidence which had been given by certain purchasing concerns. This tended to show what use defendant could have made of a discovery or a bill of particulars had they been allowed. Here, in contrast to what happened in the Ginsberg case, while a motion for a new trial was filed and the failure to furnish a bill of particulars and failure to permit discovery and inspection were listed as grounds for new trial, there was no showing that had those motions been granted appellant would have been able to make any use at his trial of information he might have obtained in that manner.

The trial began on May 4, 1959 and concluded on May 12. At the trial the accountant Newell mentioned above testified for the defendants. He had been employed by the defendants in the spring of 1956 to help in the preparation of appellant's tax returns for 1955. At that time Holt had been notified by the Bureau to prepare for an audit and Newell was then employed by Holt to examine his records. He found them "terrible" and proceeded to prepare a net worth statement for Holt and gave it to the Government agent. In addition to having accountant Newell testify and assist at his trial, Holt called as his witness one Arnold Rue, also a certified public accountant, who read the transcript of the evidence given prior to his testimony at the trial, and examined the books

2d 593, 596. Accord: Kobey v. United States, 9 Cir., 208 F.2d 583, 592; Him-

melfarb v. United States, 9 Cir., 175 F. 2d 924, 935.

and records which were used at the trial. This was done to permit him to testify as he did, as to how much tax was owing by Holt if it should develop that Holt's son had a 50% interest in the business' income. Notwithstanding these two accountants were obviously available to Holt during his trial, there was no effort made to show through them, or otherwise, what possible use could have been made of the information sought to be obtained by the motions for the bill of particulars and for discovery.

As the trial began, the nature and particulars of the Government's proof soon became clear; yet there was no motion made for a continuance based on a claim of surprise or a need for further preparation. We think that all this demonstrates conclusively that there was no prejudice resulting from the denial of these motions.

Appellant testified that in 1950, at the outset of his production of the television masts, he established a partnership with his son Stewart. The son was then 15 years of age. No written or formal partnership agreement was drawn. The testimony of appellant was: "I went over to the drill press and said: 'Son how would you like to be a full fledged partner in this venture all the way through?' He said 'I'd like it' and I said 'O.K. you are a buddy of mine, you are my right hand bower, you might as well be my partner all the way down the line.'" The witness testified that "We went 50–50 in everything." It was also shown that in 1953, Holt's lawyer prepared for him and had executed a Certificate of Partnership Doing Business Under A Fictitious Name. It was filed with the Stanislaus County recorder. This lawyer stated that Holt had come to him not for the preparation of the certificate but to have him institute a law suit. Holt was then doing business under the name of H. D. Holt & Son, and the lawyer advised Holt that this was a fictitious name, and that the certificate would have to be prepared before a suit could be brought under that name. Some of the appellant's bank accounts were opened in the names of appellant, his wife, and his son Stewart; the authorized drawers of the checks being "Herman D. or Inez V. or Stewart H. Holt."

The Government's special agent who did most of the investigating of the appellant's returns testified that he had during the investigation discussed with Holt the latter's business relationship with his son, Stewart, and that Holt had "stated that in 1953 a certificate of partnership was filed naming Stewart Holt as a partner but that that was set up only for the purpose of having Stewart protected in case anything happened to either Mr. or Mrs. Holt. He had no access to the bank accounts—by 'he' I mean Stewart. That Stewart was always claimed as a dependent on Mr. and Mrs. Holt's income tax returns. That Stewart was never told what the books showed in the way of profits. No partnership returns were filed and that this provision was set up to keep the boy from taking off." There was no showing that the son had ever drawn or claimed any share of the profits of the business, although it did appear that the son had occasionally made deposits in the bank accounts and drawn checks in connection with the operation of the business.

No partnership income tax returns were ever filed. Stewart was always claimed as a dependent on his father's income tax returns. When the accountant Newell was called in after the Government began to investigate Holt's returns and made his net worth calculation, he was told nothing about the son having any share in that net worth. Newell's report to Holt was that his net worth statement indicated that there had been an understatement of income of between $35,000 and $50,000.

■ Appellant asserts that the jury should have been permitted to determine whether 50% of all the profits from the business really belonged to the son and whether the amount of tax paid by the appellant for the three years in question was not all the tax which he owed; this is on the assumption that only one-half of the income was his. We assume that

notwithstanding appellant may have fraudulently concealed income and may have done his best to cheat the Government, yet before he could be convicted it must be shown that income tax was actually due from the accused for the year involved. See United States v. Augustine, 3 Cir., 189 F.2d 587, 589; United States v. Schenck, 2 Cir., 126 F.2d 702, 704.

No matter how improbable this claim of a division of profits may appear, (a claim that would make out the son as the delinquent), yet appellant had the right to present that claim to the jury.[8] In charging the jury the court referred to the question of the son's alleged partnership as follows: "There has also been an issue raised, a question tendered with respect to a claim of the defendant that the son was a partner in the business and that that has something to do with the question of the intent of the defendants in performing the acts that they did perform in this case. Now, the Government contends that there was no such partnership and that even if there was such partnership that it did not affect or that it only affected partly the income tax liability of the defendants in the case. The defendants, on the other hand, contend that it substantially affected their income tax liability and that it bears upon the question of their intent.

"Now, you may consider this question insofar as it bears upon the intent of the defendants in this case, and to the extent that you consider that it bears upon that intent, you may take it into account in accordance with your findings as to whether or not there was or was not such a partnership in this case." This is the only allusion made in the instructions as to the question of partnership. Appellant has specified as an error of the

court its failure more fully to define the appellant's attempted defense that he owed no more than the tax on half of the income.

The difficulty with appellant's position is that after the jury had been instructed the court inquired whether either side had objections or suggestions as to the charge, and none was offered. In short, appellant did not comply with Rule 30 of the Rules of Criminal Procedure which prohibits him from assigning as error any charge or omission therefrom "unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds for his objection." Appellant recognizes his non-compliance with that rule but urges that the failure of the court to define more fully the consequences of an equal partnership with the son was such serious error that we should note it as plain error under Rule 52(b). We decline to do so.

As this court has said in Herzog v. United States, 9 Cir., 235 F.2d 664, 666–667, and in Percifield v. United States, 9 Cir., 241 F.2d 225, 228, Rule 52(b) is to be applied in only unusual or extraordinary situations where its use is required to prevent a miscarriage of justice or preserve the integrity of judicial proceedings. There is no reason to ignore the salutary requirements of Rule 30 by noticing any so-called "plain error" here.

So far as appellant's return for 1952 is concerned, the accountant witnesses on both sides disclose a substantial understatement of net income even if the return be considered as accounting for only one-half of the income for that year. Thus appellant's own witness Rue showed that, assuming Stewart had a 50% interest in the income for 1952, yet appellant's reported income of $6729.52

---

8. Of course the credibility of Holt's account of a 50–50 division is no concern of this court. But, as suggested in footnote 4, supra, if the jury, while accepting the fact that Holt went through the form of making a partnership certificate and used a firm name yet disbelieved his assertion that the son had a 50% interest, (they might think it highly improbable that the son would have a half interest while Mrs. Holt, who did a great share of the work, would be left out completely), their disbelief might warrant a conclusion that Holt was fabricating this defense.

**280**

should have been $12,080.28 on the basis of the net worth calculations even if only one-half of the income was taken into account. This proof alone was sufficient to sustain the conviction for that year.[9] Since the sentence under each count was identical, (three months, concurrent), a failure to instruct more fully on the partnership issue cannot be regarded as so vital as to require treatment as plain error.

█ While the court told the jury that they could take the partnership matter into account on the question of intent, it is plain that that instruction was a more favorable one than appellant was entitled to have for when pressed upon cross-examination to state whether when he filed his returns he intended them to be just an account of his 50% interest and not an accounting of all of the income from the business, he testified that it was "an accounting of all, of everything." The extensive concealment and substantial understatement was there. If appellant did this intentionally his intention extended to all of it.

█ It is also contended that it was error to admit the net worth proof because one of the Government's witnesses testified that by supplementing the books of accounts with records found elsewhere, such as bank statements, he could reproduce or reconstruct a proper income tax return. It is argued that net worth evidence was therefore not proper. We have previously mentioned the gross insufficiency of entries in the appellant's books. This contention is utterly groundless. See Holland · v. United States, supra, 348 U.S. at pages 130–132, 75 S.Ct. at pages 132–133.

█ Finally, appellant asserts that he was denied a fair trial because at a certain point in the Government counsel's argument to the jury he made the following statement: "Mrs. Holt kept books of this company almost exclusively.

If the omissions were deliberate, she made the decisions, or at least carried out the plan to omit them deliberately." No objection was made to this remark of Government counsel then or later. No instruction relating to it was requested of the court. Even if the remark were objectionable, appellant cannot complain about it now. Ochoa v. United States, 9 Cir., 167 F.2d 341, 345. See Rule 51, Rules Criminal Procedure. However, we find nothing wrong about the counsel's remark as it alluded to matters which the jury might well infer from the evidence given.

The judgment is affirmed.

---

9. The exact amounts stated in the indictment need not be proven to warrant conviction. United States v. Johnson, 319 U.S. 503, 517, 63 S.Ct. 1233, 87 L.Ed.

1546; United States v. Ragen, 314 U.S. 513, 526, 62 S.Ct. 374, 86 L.Ed. 383; Maxfield v. United States, 9 Cir., 152 F. 2d 593, 597.