**Rex L. NEELY, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 16418.**

United States Court of Appeals
Ninth Circuit.

Jan. 20, 1960.

Whitney & LaPrade, Louis B. Whitney, Loretta Whitney, Paul W. LaPrade, Phoenix, Ariz., for appellant.

Jack D. H. Hays, U. S. Atty., William A. Holohan, Asst. U. S. Atty., Phoenix, Ariz., for appellee.

Before POPE, MAGRUDER and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

Appellant, Rex L. Neely, and Joe L. Short were charged in a twelve-count indictment filed in the United States District Court for the District of Arizona

with violating 18 U.S.C. §§ 201, 202, 2073 and 371. At all times relevant, appellant Neely was a farmer engaged in raising cotton, and Short was the office manager of the Pinal County (Arizona) Agricultural Stabilization and Conservation Committee (called the ASC Committee) and in such capacity charged with the duty of proper administration of the cotton acreage allotment and marketing quota program of the United States.

In Counts 1, 3 and 5, appellant was charged with tendering bribes to Short, with intent to influence Short to act in his official capacity and allow the commission of a fraud against the United States, to-wit, the procuring of a cotton allotment for appellant in excess of that to which appellant was lawfully entitled under the cotton acreage allotment and marketing quota program of the United States (18 U.S.C. § 201).[1]

In Counts 2, 4 and 6, Short was charged with accepting the alleged bribes charged to have been tendered in Counts 1, 3 and 5 (18 U.S.C. § 202).

In Counts 7 through 11, Short was charged with making false and fictitious entries in records relating to his duties, and appellant was charged with aiding, abetting and inducing Short to commit said acts (18 U.S.C. § 2073).

In Count 12, Short and appellant were charged with conspiracy to defraud the United States in the exercise of its governmental function of administering the cotton acreage allotment and marketing quota program free from bribery, improper influence, dishonesty, unlawful impairment, fraud and corruption (18 U.S.C. § 371).

Short was convicted by a jury on all counts in which he was charged except Count 12, the conspiracy count. Appellant Neely was convicted on Count 5, but acquitted upon all other counts in which he was charged. Appellant's motions for dismissal of the indictment, in arrest of judgment, and for a new trial were denied, and he was sentenced to pay a fine of $1,000. Notice of appeal was timely filed by appellant. (There was no appeal by Short.)

The District Court had jurisdiction under Title 18 U.S.C. § 3231 and this Court has jurisdiction under 28 U.S.C. § 1291.

Count 5 of the indictment, upon which appellant was convicted, charged that appellant, knowing Short's official capacity, did, on or about December 9, 1955, willfully and unlawfully tender a bribe to Short in the form of a check in the sum of $1750, payable to Short, with the intent to influence Short to act in his official capacity in committing and allowing the commission of a fraud against the United States, to-wit, the procuring of a cotton allotment for appellant in excess of that to which the appellant was lawfully entitled under the cotton acreage allotment and marketing quota program of the United States.

Count 1 charged that appellant, on April 5, 1954, tendered Short a check in the sum of $1620, and Count 3 charged that appellant, on November 22, 1954,

---

1. 18 U.S.C. § 201 provides:

"Whoever promises, offers, or gives any money or thing of value, or makes or tenders any check, order, contract, undertaking, obligation, gratuity, or security for the payment of money or for the delivery or conveyance of anything of value, to any officer or employee or person acting for or on behalf of the United States, or any department or agency thereof, in any official function, under or by authority of any such department or agency or to any officer or person acting for or on behalf of either House of Congress, or of any committee of either House, or both Houses thereof, with intent to influence his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, or with intent to influence him to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States, or to induce him to do or omit to do any act in violation of his lawful duty, shall be fined not more than three times the amount of such money or value of such thing or imprisoned not more than three years, or both. * * *"

tendered Short a check in the sum of $1410. Appellant was acquitted on the latter two counts, but all of the checks were alleged to have been tendered under the same general circumstances as charged in Count 5 of the indictment; that is, with intent to influence Short to procure an extra cotton allotment for appellant.

In order that the background of the case may be understood, we shall set out portions of a condensed statement of facts found in appellee's brief (and not controverted by appellant).

"During the years 1954 through 1956 the growing of cotton was subject to acreage controls by the Federal Government. The Secretary of Agriculture, pursuant to the Agricultural Adjustment Act (7 U.S.C. 601 et seq.), was charged with the administration of the federal program. The Secretary, pursuant to the authority given to him (7 U.S.C. 610), placed the local administration of the program in the hands of the Agricultural Stabilization and Conservation County Committees, * * * (7 CFR 7.3). Under the regulations of the Secretary of Agriculture, the county office manager of the ASC committees was charged with the day-to-day operation and administration of the various county offices (7 CFR 7.25, & 53–54).

"The administrative procedures for handling the program as regards cotton were substantially the same for 1954 through 1956. A farmer was notified of his allotment by a Notice of Allotment; after the cotton crop was growing, the fields were measured to determine whether a farmer was planted within his allotment; the farmer then had the election, if he were overplanted, to destroy the excess or harvest the entire crop but pay a penalty of about 17½ cents per pound on short staple cotton.

"Before a farmer could sell his cotton, he had to obtain from the ASC committee a marketing card. To be eligible for a marketing card, the farmer must have finally been measured as planted within his allotment or have paid the penalty on the excess (7 CFR 722.757 and 722.-765).

"If a farmer did not want to plant his allotment, the only way he could legally transfer it to another farmer was by means of reconstitution of the two farms into one unit— commonly called a combination by farmers. By this method the allotments were combined in one allotment representing the sum total of the former two (7 CFR 722.717(h)(2))."

When an investigation was made in 1957 concerning irregularities in the Pinal County ASC Committee office, appellant gave at least two written statements to the authorities covering his transactions, and at the time of his trial upon the present charge testified in court. His versions of the details of the transactions varied in some particulars. According to one version, appellant in 1954 was looking for additional cotton acreage and was advised by a friend, now deceased, to contact Short, with whom he had been somewhat acquainted. Another version of Neely's was that the now-deceased friend had mentioned Bill Burns. He told Short what he wanted and was told by Short that he thought something could be worked out. Later, in March, 1954, Short told appellant that W. R. Burns had some land available and that he wanted $20 or $25 per acre for the allotment. About March 20, 1954, appellant gave Short a check for $1620, payable to Short, at the rate of $20 per acre for 81 acres. Appellant claimed that a day or two later he talked to the now-deceased friend and to his banker, and was told that he should have a lease upon the land in question. He then stopped payment upon the check, saw Short, and told him that he wanted a lease on the farm. He claimed that Short told him that he would get in contact with Burns and get a lease from him.

Early in April, 1954, appellant again saw Short, was shown a lease which had already been made out, and on which appeared the signature "W. R. Burns". Appellant signed this lease, Short witnessed his signature, and appellant gave Short on April 5, 1954, a check for $1620 payable to Short (this was the check mentioned in Count 1). Appellant later received from Short a revised notice of allotment, showing additional acreage for cotton planting.

Concerning the charge contained in Count 3, appellant claimed that late in 1954 he wanted to get an additional allotment for the crop year 1955. He contacted Short at that time at the ASC office and asked him if the Burns cotton acreage was going to be available for the 1955 crop year. Short stated that he would let him know. He later told appellant that there were 70.5 acres available, and appellant gave Short a check payable to Short on November 22, 1954, for $1410. Appellant did not receive a lease for the 1955 acreage; in fact, a lease was not mentioned. Appellant did not receive a revised notice of allotment for the additional acreage.

As to the charge contained in Count 5, appellant claimed he talked to Short in the fall of 1955 about the availability of the Burns acreage for 1956. Short told him there would be 60 acres available, and appellant on December 9, 1955, gave Short a check payable to Short for $1750.

Appellant explained that the rate asked by Short at that time was $25 per acre, and that he, appellant, added $250 to assist Short with hospital expenses, as "I had heard that his wife was going to have an operation." He did not receive a lease covering the 1956 acreage and there was apparently no discussion of such a lease. Also, appellant did not receive a revised notice of allotment showing the additional acreage.

It appeared from the testimony of Short that, in fact, there was no W. R. Burns, and that it was just a random name selected by Short. It further appeared that Short had prepared the written lease and had written thereon the name "W. R. Burns" prior to the time that he had presented it to appellant. (The land described in the lease was actually in the name of Tredway.)

■■ Appellant contends he was entirely innocent of any wrongdoing and that he had no knowledge that W. R. Burns was nonexistent. He concedes he gave the three checks to Short in the amounts and on the dates specified, but contends that there was no proof of criminal intent on his part. Criminal intent is an essential element of the crime of bribery. United States v. Labovitz, 3 Cir., 1957, 251 F.2d 393. The existence of intent is a question of fact for the jury to determine not only from defendant's act in giving the money to Short "but from that together with defendant's testimony and all of the surrounding circumstances." Morisette v. United States, 1952, 342 U.S. 246, 276, 72 S.Ct. 240, 256, 96 L.Ed. 288.

■ We think there was sufficient evidence for the jury to conclude that appellant had the requisite criminal intent.

There were various inconsistencies and contradictions in appellant's story. In late 1956 or early 1957, appellant told representatives of the government that he had a lease for an additional allotment for 1956 and one of the representatives testified appellant stated he would bring it to the office if he could find it, although of course the fact was that appellant had no lease for that year.

In his first statement to the authorities in early 1957 appellant said that "Taking the crop lease into consideration, I was not overplanted in 1955 crop year." This is inconsistent with his later statement that "* * * in 1955 I knew I was overplanted and would have to plow up some cotton * * *"

Appellant admitted that in paying Short at the rate of $25 per acre for the 1956 crop allotment that this price was considerably less than was being paid for similar crop allotments in the same area by other persons. His explanation of giving Short an extra $250

because he "had heard that his wife was going to have an operation" could have been questioned by the jury, considering that he contended also that he only knew Short slightly.

Each of the three checks appellant gave Short were made out to Short personally and not to the nonexistent Burns. The jury could compare appellant's testimony that his now-deceased friend first mentioned Bill Burns with Short's statement that the name Burns was picked at random by him.

Appellant claims that in 1954 he was insistent that a lease was a necessary part of the transaction, and that he went to the length of stopping payment on the first check until he got a written lease. However, he admitted that he did not receive a lease for either the 1955 or 1956 allotment and that no lease was mentioned. Further, appellant received a revised notice of allotment for 1954 but none for either 1955 or 1956.

In the crop year 1955 appellant farmed in Maricopa County as well as Pinal County. He owned land and leased land in both counties. In Maricopa County, where he was not dealing with Short, he was required to form a combination, which he did not do in Pinal County.

In 1955 appellant was overplanted in both Maricopa County and Pinal County. In Maricopa County he was refused a marketing card until he paid his penalty for the excess cotton, but in Pinal County where he knew he was overplanted, Short caused the record to show appellant was within his allotment and appellant received his marketing card. Appellant destroyed some of his cotton "by discing out some poor spots and squaring the ends," but he claimed he did not know the extent of his overplant.

It would appear that in the year 1955 appellant's experience in Maricopa County should have taught him the right way to proceed. Yet, in 1956, even including the 60 acres appellant bought from Short, he was still overplanted by over 100 acres. The penalty for such overplanting approximated $30,000. When appellant received his marketing card in 1956 it showed a legal allotment of 306.7 acres although he planted and harvested some 477.7 acres. He knew he was overplanted, but failed to destroy his overplant because "I thought I might get by without plowing up my excess cotton."

Looking at such reckless conduct of appellant, the jury (as stated in appellee's brief) "could well have concluded that appellant acted like a person who had bought the county manager."

The jury had a right to appraise appellant's story in determining whether or not he was telling the truth. As this court stated in the recent case of Holt v. United States, 9 Cir., 1959, 272 F.2d 272, 275:

"If it was apparent that defendant was making false statements in the case, then the jury could take such statements into consideration in weighing the question of Holt's guilt and his guilty knowledge.

"The settled rule in such cases is stated in Wilson v. United States, 162 U.S. 613, 620, 16 S.Ct. 895, 898, 40 L.Ed. 1090: 'Nor can there be any question that, if the jury were satisfied from the evidence that false statements in the case were made by the defendant * * * they had the right, not only to take such statements into consideration, in connection with all of the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense, made or procured to be made as in themselves tending to show guilt.'"

All of the inconsistencies in appellant's various statements could properly be considered by the jury in determining whether he did or did not testify to the truth and whether he did or did not have criminal intent in making payments to Short.

The jury evidently gave appellant the benefit of the doubt when they acquitted him of Counts 1 and 3; they apparently

believed that by the time the third check was given by the appellant to Short, there could be no reasonable doubt as to appellant's criminal intent to bribe Short.

We hold that the evidence of guilt of appellant as to the charge in Count 5 of the indictment was amply sufficient.

The judgment is affirmed.