**Milton BIEBER and Donald Paul Myers,**
**Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 16505.**

United States Court of Appeals
Ninth Circuit.

March 3, 1960.

Douglas T. Corbin, San Francisco, Cal., for appellants.

Laughlin E. Waters, U. S. Atty., Robert John Jensen and Timothy M. Thornton, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before MAGRUDER, HAMLIN and MERRILL, Circuit Judges.

HAMLIN, Circuit Judge.

The appellants, Milton Bieber and Donald Paul Myers, were indicted with six other persons in a nine-count indictment brought by the grand jury in the Southern District of California. The other six co-defendants pleaded guilty. Bieber and Myers were charged only in Counts 1 and 2 of the indictment. Count 1 charged appellants and three others with conspiracy to counterfeit obligations of the United States in violation of 18 U.S.C. § 371; to sell and transfer counterfeit obligations of the United States in violation of 18 U.S.G. § 473; and to utter counterfeit obligations of the United States in violation of 18 U.S.C. § 472.

Count 2 of the indictment charged Bieber and Myers and one Daniel Migdol with falsely making, forging and counterfeiting 2600 $20 Federal Reserve Notes and 2600 $10 Federal Reserve Notes. Upon a trial by a jury, each of the appellants was found guilty as charged in Counts 1 and 2 of the indictment. Appellants were each sentenced to two years imprisonment on Count 1 and to five years imprisonment on Count 2, said sentences to be served concurrently. Appeal was taken to this court from the judgment of conviction only as to Count 2.

As set out in appellants' brief, the following four specifications of error are relied upon:

"1. In view of the limited probative value of the direct testimony against appellants, the District Court erred in failing to grant appellants' oft-repeated request for a hearing to determine the facts surrounding the government's allegation of surprise following certain testimony of a government witness, with the result that the jury was exposed to impressive unsworn evidence of an exceptionally damaging genre, the prejudicial effects of which could not have been nullified by the withdrawal of the witness' extra-judicial written statement from evidence at the close of the government's case.

"2. The District Court erred in failing to give the government's proposed Supplemental A Instruction.

"3. The District Court erred in refusing to give appellants' proposed Instruction 11.

"4. The District Court erred in refusing to give appellants' proposed Instruction 8."

The facts relative to specification of error Number 1 may be summarized as follows.

In his opening statement the prosecutor told the jury that he expected to prove that Bieber and Migdol had been partners in a TV repair shop near Los Angeles, and that the two of them decided that "they would solve their financial difficulties by the simple expedient of making their own money." He further said that Migdol was experienced in the printing business and that he and Bieber leased a printing press, obtained the necessary supplies and photographic equipment, and set up a regular printing operation in the back room of their TV shop. He continued:

"Now, in the latter part of March of 1958 * * * they actually commenced photographing, Danny Migdol who will testify here actually started photographing tens and twenties, and he did make the plates for the printing of the counterfeit bills.

"Now, prior to the time of the actual printing of the bills, in the latter part of March, Donald Myers * * * was introduced to Danny Migdol by * * * Milton Bieber.

"And so, on the date of the printing of the money, which was in the evening at the TV shop * * *, both Donald Myers and Milton Bieber were present. Milton Bieber stood by the door in a chair and it was arranged that the electrical power that operated the press in the back room would be connected to an outlet, hooked up to the chair on which Milton Bieber was sitting, so that if anybody approached, he could just move his chair a slight bit, pulling the plug out, and everything would go dark and the machine would stop operating in the back room. So that at the time of the printing, Donald Myers and Milton Bieber were actually standing lookout for Danny Migdol, who was actually in the back room printing up the money."

Some $78,000 in counterfeit tens and twenties were printed upon this occasion.

The prosecutor then went on to outline to the jury the details of the activities of all eight defendants in the passing and the distribution of this counterfeit money. The details of the remainder of the opening statement we are not concerned with on this appeal.

Migdol, who had pleaded guilty to Counts 1 and 2, was then called as a witness by the prosecution. Migdol testified in detail concerning the preparations for the printing of the money, and as to the details of the printing itself on March 26. His testimony regarding these matters was substantially in accord with the prosecutor's opening statement. The following then took place:

"Q. Did you have any warning arrangements for the printing? A. No. The market, the adjoining building of our television store is a Laundromat, a 24-hour Laundromat, and our shop is known to be open until around 9:00 o'clock at night, so if a person was in there, it wasn't out of the ordinary that we are in there; I was back there, I was in a locked room, and it is in the middle of the building, and so with the hi fi going they can't—it was next door at the same time—they couldn't actually hear what was going on.

"[Prosecutor]: Your Honor, I am going to beg the court's indulgence in my asking this witness leading questions. He has turned hostile. His testimony is absolutely

opposite to what he has told me previously.

"The Court: You may go ahead and ask him leading questions.

"[Defense Counsel]: May I make an objection at this point, your Honor? * * * if your Honor please, counsel for the government has indicated a protocol that he is going to follow now and I think it is highly objectionable, and the damage will have been done merely by asking the question. I think that there should be a preliminary hearing outside of the hearing of the jury to determine whether the government is going to be allowed to impeach its own witness."

The Court overruled the objection and, without granting a hearing, permitted the prosecutor to put leading questions to Migdol. These questions concerned a conversation between the prosecutor and Migdol in the former's office the day before. Migdol admitted some things the prosecutor asked him if he had said and denied others. At first he said that Bieber and Myers were not present on the night the money was printed and denied that the warning system was set up. He was then asked whether he had not told the prosecutor that there had been a "very simple warning system" whereby the power cord from the printing press was "wrapped around the legs of the chair by the door which was occupied by Bieber sitting on the chair so he could kick the cord out by moving his foot." The witness answered, "I don't think so, not to my recollection." On further questioning Migdol stated, "Now I did have a system set up there. If I did have somebody sitting out there, it was a simple system, but at the time I printed the notes there was nobody in that television shop." On further questioning, Migdol admitted that Myers and Bieber were there when he entered the room in the back and started printing, but that when he came out they were gone.

During the course of examination of Migdol, it developed also that he had made a written statement in Chicago at the time of his arrest, concerning his activities as charged in the indictment, and at one time in his examination on the trial, a portion of this written statement was read by the witness aloud before the jury.

Both counsel for appellants and the Court stated at that time that the paragraph read by the witness to the jury was not impeachment of anything to which the witness had already testified, and the Court struck out the paragraph that the witness had read, saying, "The Court on its own motion will strike from your minds what he had just read on the grounds that it is not impeaching, because he has already told you about that this morning."

A few days later (at the close of the day of Friday, September 12), out of the presence of the jury, the government offered and the Court admitted the entire Chicago written statement into evidence. However, when the trial resumed on the following Tuesday morning, September 16, the government rested and on motion of appellants' counsel, again out of the hearing of the jury, the Court struck from evidence the Chicago written statement. The jury at no time saw this written statement, nor were any of its contents read in the presence of the jury with the sole exception of the one paragraph above referred to, which immediately after it was read was stricken by the Court as not impeaching.

■■ Appellant in his specification of error Number 1 complains of the Court's action in not granting a hearing to determine the facts surrounding the government's alleged surprise.

However, there is no rule requiring the Court to hold such a hearing.

In United States v. Maggio, 3 Cir., 1942, 126 F.2d 155, at pages 158–159, the Court stated:

"The defendants contend that what the prosecution did was to impeach its own witness and that under pretext of showing a prior contradictory statement by that witness injected into the evidence much

that was hearsay. The strict rule is that under no circumstances may a party impeach his own witness. A rather general modification of this rule, accepted by the Federal Courts * * * is that a witness may, with leave of court, be examined as to prior contradictory statements if his testimony at the trial comes as a surprise to the party calling him as a witness. * * * The trial court was entitled to * * * thereupon exercise its discretion in permitting the examination as to the prior self-contradictory statements. United States v. Graham, 2 Cir., 102 F.2d 436. Certainly the trial judge is not required in every such case to interrupt the trial in order to investigate whether the allegation of surprise is justified by the facts."

On oral argument counsel for appellant acknowledged that this is the correct rule and that a hearing is not a necessary prerequisite to the examination of a witness as to a prior contradictory statement. If the Court is satisfied that the "surprise" exists, either from the statement of counsel or otherwise, that is all that is required to permit the examination of the witness as to his prior contradictory statement. United States v. Maggio, supra; Gendelman v. United States, 9 Cir., 1951, 191 F.2d 993; Wheeler v. United States, 1953, 93 U.S. App.D.C. 159, 211 F.2d 19; DiCarlo v. United States, 2 Cir., 1925, 6 F.2d 364.

Neither do we think the prosecutor exceeded the permissible bounds in the actual examination of Migdol concerning his prior contradictory oral statement. The situation here was not the same as in United States v. Block, 2 Cir., 1937, 88 F.2d 618, 620, relied on by appellant. In that case the Court, although freely conceding that a prosecutor in such circumstances should have "the greatest latitude in examination and allowed to use the earlier statement," pointed out that the prosecutor had read an entire prior written statement of the witness to the jury, asking the witness question by question whether or not the statement was true. The Court states, "This was continued until the whole of the statement had been read to the jury, though all that was of any moment he explicitly disclaimed."

In this case, Migdol, after at first failing to testify in accordance with the prosecutor's opening statement of the connections of appellants with Migdol in the manufacturing of the money, did, after being questioned concerning his prior oral statement, change his original testimony. He first testified that there was no warning system of any kind. Later he testified that he did have a simple warning system. He first testified that neither of appellants was present when he made the counterfeit money. Later he testified that appellants were present in the building and in the next room at the time that he started to manufacture the money, but that they were not present when he had finished his operations.

During the course of the examination by the prosecutor Migdol corrected his prior testimony in at least two important particulars which tended to connect the appellants with the manufacture of the counterfeit money. The corrected testimony of Migdol related to matters which were admissible against the appellants, and were thus not "mere hearsay, entirely inadmissible as substantive evidence." Feutralle v. United States, 5 Cir., 1954, 209 F.2d 159, at pages 162, 163.

Concerning the admission in evidence of the Chicago written statement of Migdol, this could have in no way prejudiced appellants because it was stricken from evidence and marked only as an exhibit for identification without the jury having been either apprised of its admission into evidence or of the fact that it had been stricken from evidence.

We see no merit in appellants' specification of error Number 1.

Appellants' remaining three specifications of error complain of the Court's failure or refusal to give certain instructions. A short answer is that appellants

failed to comply with the requirements of Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. Rule 30 reads in part as follows:

> "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

It was not until after the jury had retired to deliberate upon its verdict that appellants' counsel attempted to make any objection to the Court's instructions. After the jury had retired the following proceedings occurred:

> "Mr. Warner: Just for the record may I take an exception?
>
> "The Court: All right, take an exception. Go ahead.
>
> "Mr. Warner: We have your blessing then.
>
> "The Court: Go ahead, go ahead.
>
> "Mr. Warner: Okay. In behalf of the defendants Bieber and Myers I take exception to the instructions numbered Government's 3, 6, 7 and 16, and take exception to the Court's refusal to give instructions 1 to 13, inclusive, of the defendants' proposed jury instructions.
>
> "The Court: All right. Did you state all exceptions?
>
> "Mr. Warner: Yes, sir, I did."

It will be seen that not only did appellants' counsel fail to make any objection to the Court's instructions before the jury retired, but also that appellants' counsel failed to follow the provisions of the rule which require a party to state "distinctly the matter to which he objects and the grounds of his objection."

We are cognizant of the "plain error" provisions of Rule 52(b) and the recent decisions thereon. Brown v. United States, 9 Cir., 1955, 222 F.2d 293; Herzog v. United States, 9 Cir., 1955, 226 F.2d 561; Herzog v. United States, 9 Cir., 1956, 235 F.2d 664; Percifield v. United States, 9 Cir., 1957, 241 F.2d 225; Holt v. United States, 9 Cir., 1959, 272 F.2d 272. Although counsel has not contended that there was "plain error" in the Court's instructions as described in Rule 52(b), we have examined the instructions given and refused, and can find neither plain nor any other kind of error.

Judgment is affirmed.