Meyer Harris **COHEN**, aka Michael "Mickey" Cohen, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 17503.

United States Court of Appeals Ninth Circuit.

Jan. 12, 1962.

See also 283 F.2d 50.

Belli, Ashe & Gerry, Gene Rosenberg, San Francisco, Cal., Jack A. Dahlstrum; A. L. Wirin, Los Angeles, Cal., for appellant.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, HAMLEY and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

Cohen was convicted under eight counts of a thirteen count indictment, his motion for new trial was denied, and he appeals. The sentences under counts 2, 3 and 4 are each $10,000 fine and five years imprisonment, the fines cumulative and the prison terms consecutive. The sentences under counts 5 and 9 are each $5,000 fine and 2½ years imprisonment, the fines cumulative and the prison terms consecutive, but these fines and terms are concurrent with those imposed under count 2. The sentences under counts 8 and 10 are each $5,000 fine and 2½ years imprisonment, the fines cumulative and the prison terms consecutive, but these fines and terms are concurrent with those

imposed under count 3. The sentence under count 13 is the same as, and concurrent with, that under count 4. Thus the total fines are $30,000 and the total prison terms are fifteen years.

We will therefore consider, first, those contentions that relate to all counts, and, second, those that relate to counts 2, 3 and 4. Only if we find that the conviction under one or more of those counts cannot stand will it be necessary to consider contentions that relate to one or more of the remaining counts.[1]

Counts 2 and 3 charge violation of 26 U.S.C. § 7201, by wilful filing of false and fraudulent income tax returns for the respective years 1957 and 1958. Count 4 charges violation of 26 U.S.C. § 7201 in wilfully attempting to defeat and evade the payment of income taxes duly assessed for the years 1945 to 1950, inclusive, by various fraudulent means. Counts 5, 8, 9 and 10 charge violations of 26 U.S.C. § 7206(4), concealment of property on which levy is authorized, with intent to evade and defeat the collection of income taxes then due, for the years mentioned in count 4. Count 13 charges violation of 18 U.S.C. § 1001, a false statement to the Internal Revenue Service.

The trial was a long one. There were over 180 witnesses, and there are more than 8,000 pages of reporter's transcript.

947 government exhibits and 27 defense exhibits were produced. Under these circumstances, it would unduly prolong this opinion to set forth the evidence in detail. Basically, counts 2 and 3 involve unreported income. Much of it was received by appellant in the form of loans, but, according to the government's theory, it was actually the product of fraud or extortion—"ill-gotten gains". A great many such transactions were proved, and they show, taken together, a fairly consistent pattern of behavior by appellant. Much of this evidence was also pertinent under count 4. It charged that appellant placed his assets in the name of others, deposited them with others, dealt in currency, caused his obligations to be paid through and in the name of others, caused moneys paid to him to be paid through and in the name of others, and paid other creditors but not the government, all for the purpose of defeating the payment of his income tax liabilities. Some was also pertinent under counts 5, 8, 9 and 10, which charged respectively, concealment of interests in two Cadillacs, a 12.69 carat diamond ring, and a collection of valuable jewelry. Some was also pertinent under count 13, which charged false representations that no person had any property or rights belonging to appellant, except his interest in his life story. Speaking broadly, we think that

1. Barenblatt v. United States, 1959, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115; Sinclair v. United States, 1929, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692; Abrams v. United States, 1919, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173; Claassen v. United States, 1891, 142 U.S. 140, 12 S.Ct. 169, 35 L.Ed. 966; Lawn v. United States, 1958, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321; Hirabayashi v. United States, 1942, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774; Brooks v. United States, 1925, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699; Stein v. United States, 9 Cir., 1959, 263 F.2d 579; Lemon v. United States, 9 Cir., 1960, 278 F.2d 369; Chin Bick Wah v. United States, 9 Cir., 1957, 245 F.2d 274; Goldbaum v. United States, 9 Cir., 1953, 204 F.2d 74; Winger v. United States, 9 Cir., 1956, 233 F.2d 440; Cohen v. United States, 9 Cir., 1953, 201 F.2d 386.

We can find nothing in the record to indicate that the sentences imposed under counts 2, 3 or 4 respectively would have been less severe if there had been no conviction under counts 5 and 9, or 8 and 10, or 13. On the contrary, those are, in a sense, subordinate counts, involving, as to counts 5, 8, 9 and 10, specific assets that were concealed, and, as to count 13, a false statement. Each represents one item in the great mosaic of facts which, in total, support counts 2, 3, and 4. Thus the case does not fall within such cases as Yates v. United States, 1957, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 and Ballew v. United States, 1895, 160 U.S. 187, 16 S.Ct. 263, 40 L.Ed. 388, or our decisions in Roberts v. United States, 9 Cir., 1956, 239 F.2d 467; Fuentes v. United States, 9 Cir., 1960, 283 F.2d 537 and Russell v. United States, 9 Cir., 1961, 288 F.2d 520.

the government produced ample evidence to go to the jury on these questions. We will discuss relevant portions of the evidence in more detail in considering the questions raised by appellant.

1. *There was no prejudicial error in calling appellant's counsel as a witness.*

This contention relates to all counts. Appellant had but one attorney (Dahlstrum) throughout the trial. He had been called before the grand jury as a witness, and had given the government an affidavit as to certain facts. He was told by government counsel after the return of the indictment, but before he became sole trial counsel for appellant, that he would be called. When government counsel, outside the hearing of the jury, told the Court that he wished to call Dahlstrum, the latter made no objection; he only asked the Court to order him to testify, so that he might be still free to argue. The Court did so, saying that the only restriction would be that Dahlstrum not argue his own credibility. After his testimony, that restriction was removed. He testified on a Friday. The following Monday, he moved for a mistrial, which was denied. The ground was that his credibility had been put in issue "as it affects the whole position of me as counsel for the defendant in the matter with the jury." The Court, in denying the motion, said, "I think in my judgment there is not the remotest possibility of any difficulty arising on account of it."

The Court was right. The actual testimony of Dahlstrum occupies only 14 pages in the transcript. No objections of any kind were made. No attack was made upon his credibility, either in the questions asked, or when the case was argued to the jury. His testimony established certain facts as to the manner of handling an advance by one Pomeranz to appellant, and a few other minor matters. It is significant, too, we think, that when Pomeranz testified, Dahlstrum told the Court that he would have to take the stand on appellant's behalf. This is a far cry from the situation in People v. Lathrom, 192 A.C.A. 239, 13 Cal.Rptr. 325, 1961, upon which appellant relies.

We do not commend the practice of calling defendant's trial counsel as a witness in a criminal case. We think it probably could have been avoided here. On the other hand, the lips of a material witness who is also a lawyer should not be sealed merely because a defendant employs him as his counsel.

2. *The Court did not err in denying motions for mistrial based upon newspaper publicity.*

This contention, too, affects all counts. The trial began May 2, 1961; the jury was instructed on June 28. The jury was permitted to separate at the end of each session, until the matter was submitted to them, at which time they were locked up, and no objection was made to this procedure. There were four motions for mistrial. One was on May 10, based upon large front page headlines in the Los Angeles Examiner, captioning two juxtaposed articles. One reads: "2300 Tax Sleuths Asked; $7 Billions Missed", and heads an A. P. Washington release stating that the Treasury had requested an appropriation for 2300 more agents "to run down tax cheaters." The other reads: "Huge 'Long Green' Bank Deposits for Mickey Cohen Greenhouse Bared" and "Cohen Given $46,000 Loans, Court Told", this article relating to the trial. The second motion was on June 5, and was based upon articles, in two papers, about the shooting of one Max Tannenbaum, described in headlines as "Cohen Pal" or "Friend". There were brief references in the articles to this case, and to the fact that Tannenbaum might have been a witness. The third motion was on June 19, based upon an article in the Los Angeles Mirror headed "Cohen Will Take Stand At Trial." The fourth motion was on June 29, based upon an article in the Los Angeles Times headed "Near $1 Million Cost Involved in Cohen Cases."

On the first day of the trial, and repeatedly thereafter,—the government says 69 times—the Court instructed the jury as to its duty not to read, see or look at anything—including specifically newspapers—relating to the trial. It did so

forcefully on May 10, without referring to any particular article, and specifically asked the jury if they were following the admonition. It gave a similar admonition on June 5 and an emphatic one on June 16, when a recess was taken to June 20, and it gave its customary one on that day. As to the June 29 item, the record indicates that the case had been submitted to the jury when it appeared, and the Court questioned the bailiff in charge to make sure that they had had no chance to see the article in question. It also questioned the jury after the verdict was received.

There is no showing that any juror read or even saw any of the offending articles; it is merely urged that they must have seen them. To so hold, we would have to presume that the jurors disregarded repeated and emphatic instructions by the Court. The presumption is the other way. As Mr. Justice Holmes said in Holt v. United States, 218 U.S. 245, at p. 251, 31 S.Ct. 2, at p. 6, 54 L.Ed. 1021: "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day."

■ The matter was within the sound discretion of the trial judge; we cannot say that his judgment about it was wrong. (See Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed. 2d 1250; Itow v. United States, 9 Cir., 1915, 223 F. 25; Madden v. United States, 9 Cir., 1927, 20 F.2d 289; Cohen v. United States, 9 Cir., 1953, 201 F.2d 386; Yates v. United States, 9 Cir., 1955, 225 F.2d 146, rev'd on other grounds, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356).

3. *The admission of testimony as to appellant's religious activities was not prejudicially erroneous.*

This contention likewise affects the convictions under all counts. The evidence shows that Cohen, who had been previously convicted for income tax frauds, was well aware that money received as a loan or as a gift is not taxable income. It shows that during the years 1957 and 1958 he received very large sums of money from a remarkable variety of persons, rich and poor, prominent and obscure. It shows a studied attempt on his part to cast most of these transactions in the form of loans, many purportedly secured by "interests" in his life story, which he had already conveyed away in 1951 to one Guttman. The particular brand of magic that he used in obtaining these moneys does not always appear. That there was fraud involved in many instances is plain. Extortion appears in one or two.

Among those who advanced moneys to Cohen were an evangelist named Vaus and a business man, who was also an evangelist, named Jones. Their story begins with Vaus, author of a book entitled "Why I Quit Syndicated Crime." Vaus testified before Jones did. He advanced, to or for the account of Cohen, numerous sums of money, totalling not less than $2494.12 plus the use of a car, an office, a secretary, and credit cards. He also obtained at least $3,000 for Cohen from one Blythe. Cohen dictated part of his "life story" to Vaus' secretary. In the course of testifying, Vaus mentioned telling Cohen of the latter's need for a "complete severance from the things of the past and a positive identification with God through Jesus Christ." He described how, in September of 1956, and at the request of Jones, he arranged for Cohen to meet the evangelist Billy Graham in New York. In connection with a previous meeting between himself, Graham and Cohen, he said that Graham had told Cohen that the latter's need was for a relationship with God, and that many people were praying for him. There was no objection to any of Vaus' testimony.

Jones became interested in Cohen along with Vaus. He, too, advanced substantial sums to or for the account of Cohen—at least $4,000.00. He testified that in November, 1955, at Vaus' suggestion, he met with Vaus and Cohen, at which meeting, being himself a convert, he discussed the possibility of a similar

miracle for Cohen. At this point, out of the jury's hearing, counsel for Cohen objected that the testimony was prejudicial, offering to stipulate to the amount of money received from Jones. Government counsel stated that Cohen was "involved in a confidence game to obtain money from these people." The Court, in effect, overruled the objection, but directed counsel to avoid going into more detail than necessary.

The witness then described another meeting with Cohen, following which he and Cohen prayed together, and Cohen "turned his life over to Christ." No further objection was then made. Jones then testified to numerous advances to Cohen. This was followed by testimony about his and Vaus' arranging the Graham meeting in New York, all of which was financed by Jones. Defense counsel then suggested to the Court that he was in a difficult position, and did not want to be in the position of objecting. The Court again directed Government counsel to shorten the matter. Cohen's counsel's statement was hardly an objection. The New York-Graham meeting matter was then described, not as to Cohen's beliefs, but as to his behavior, which was certainly not that of a convert. Counsel did object, on the ground of irrelevancy and immateriality. The testimony then returned to money matters. On the morning of the next trial day, counsel moved to strike the testimony as unduly prejudicial. This was denied.

The only other incident mentioned in Cohen's briefs is in the testimony of a Dr. Krause, who "loaned" Cohen $25,000 on the "security" of an interest in Cohen's life story. Over objection, he testified to the fact that there was a religious observance at Krause's home on an occasion when Cohen was there and introduced Krause to one Sica.

It is urged that allowing this testimony invaded Cohen's right to freedom of religion under the First Amendment, and, if it did not, was still prejudicially erroneous. We do not agree. In the first place, the First Amendment point was never raised in the trial court. (See Rule 18, subd. 2(d), rules of this court) 28 U.S.C.A. Moreover, the way of the confidence man would be easy if he could obtain money from the religious by willfully false protestations of belief and then, when brought to book, take refuge in the First Amendment. We are cited to no case upholding Cohen's contention. United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148, does not. It does hold that the validity or veracity of a religious doctrine cannot be inquired into by a Federal Court, stating "that the District Court ruled properly when it withheld from the jury all questions concerning the truth or falsity of the religious beliefs or doctrines of respondents" (322 U.S. p. 88, 64 S.Ct. p. 887). It does not hold that a court or jury cannot decide that the profession of a belief is fraudulent. What the District Court had submitted to the jury was "Did these defendants honestly and in good faith believe these things?" The Supreme Court did not hold that this was improper. Only Justice Jackson would have gone as far as counsel now urge us to go. So here—nowhere, either in argument or in the court's instructions or elsewhere in the record is there any intimation that the jury was to pass upon the truth or falsity of Christian or Jewish doctrines that Cohen may have professed to believe.

■ Here, the religious incidents were a minor part of a very voluminous record, and they did not relate directly to any of the specific sums upon which the government's case under counts 2 and 3 was founded. Vaus' and Jones' testimony did show that Cohen got moneys from them, which he could have used to pay his taxes, pertinent under count 4, and did show a callous disposition to obtain money by fraud, pertinent under counts 2 and 3.

In Ballard, the whole case involved religious beliefs. In this case, the religious "issue" was minor and incidental to a showing of wholesale frauds and some extortion, entirely unconnected with religion, and to a showing that Cohen did have money to pay taxes at a time when he professed to have nothing. We cannot

conceive that the result would have been different if the testimony as to religion had not been presented.

Nor do we find here the deliberate use of religion to prejudice the jury of which counsel was guilty in the other cases on which Cohen relies. (See Skuy v. United States, 8 Cir., 1919, 261 F. 316, 317 and Ross v. United States, 6 Cir., 1950, 180 F.2d 160)

4. *The claim that the court erred in refusing to instruct upon lesser included offenses is not properly brought before us.*

This claim affects counts 2, 3 and 4. Three instructions, numbers 37, 49 and 56, were proposed. The court did not give them. Rule 18, subd. 2(d) of the rules of this court requires that the specification of error in the brief "shall set out the part referred to totidem verbis, whether it be in instructions given or in instructions refused, together with the grounds of the objections urged at the trial." This has not been done. We might be disposed to overlook this failure to comply with our rules, in view of the voluminous record and the short time within which the opening brief was required to be filed. (But see Kobey v. United States, 9 Cir., 1953, 208 F.2d 583, 587–588; Percifield v. United States, 9 Cir., 1957, 241 F.2d 225; Benatar v. United States, 9 Cir., 1954, 209 F.2d 734; Gordon v. United States, 9 Cir., 1953, 202 F.2d 596.)

But there is a more serious difficulty. At the trial, counsel for Cohen did not comply with Rule 30, F.R.Crim.Proc., 18 U.S.C.A., which states: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

Counsel for Cohen proposed some eighty-three different instructions. The court meticulously followed Rule 30. Five days before the jury was instructed, the Court handed to the attorneys and filed an "advice to counsel", in writing, stating which instructions it would give and which it would refuse. Of Cohen's instructions, it "refused" ten and listed fifty-seven as "covered", including the three now in question. As to these, it stated "Defendant's 37, 49 and 56 all relate to lesser included offenses. The jury will be instructed that if they find defendant merely and only wilfully failed to report or pay tax or keep records, etc., without specific intent to evade, etc., acquittal is required."

In essence, instruction 37 would tell the jury that the offense defined in 26 U.S.C. § 7203 is a lesser included offense within 26 U.S.C. § 7201, the latter section being the basis for counts 2, 3 and 4. This is the only one of the three instructions proposed that is now urged upon us. Numbers 49 and 56 would have told the jury that the offense defined in 26 U.S.C. § 7203 is a lesser included offense within 26 U.S.C. § 7206(4), the basis for counts 5, 8, 9 and 10, but no such claim is now made.

After the court had charged the jury, counsel said "I am not specifying any particular part of the charge, * * * but merely wish at this time to object to the failure to give all requests made by the defendant, specifically enumerated and set forth as having been refused in the advice to counsel * * * filed in the case * * * I will refer to those portions of that document which state which of defendant's instructions were refused, and I object to them as having been refused." No specific reference was made to instructions 37, 49, and 56. They were not listed by the court as "refused", but as "covered". There was no objection to the court's failure to give the instructions that it designated as covered. Nothing that counsel said in any way called the court's attention to those listed as covered.

Moreover, no grounds for objection were stated. The court evidently felt that its instructions were more favorable than requested instruction 37, in that, in substance, they would require acquittal if all that the jury found was an offense of the type described in 26

U.S.C. § 7203. It was entitled to think that counsel felt the same way, absent a specific objection, stating grounds. Counsel having elected to gamble, under the court's instructions, upon an acquittal, is not now in a position to ask us to give him a new chance at conviction of a lesser included offense.

We have repeatedly applied and enforced Rule 30.[2] This is not, in our opinion, an instance of plain error or a defect affecting substantial rights under Rule 52(b).[3] Trial counsel frequently prefer to gamble as counsel did here. Their doing so does not produce prejudicial error if they lose. Under the circumstances, we do not decide whether proposed instruction 37 is a correct statement of the law.

5. *The evidence sustains the verdict as to counts 2 and 3.*

■ Essentially, appellant's argument under this heading is one that should have been, and was, addressed to the jury. There is ample evidence from which the jury could conclude that the moneys which appellant admittedly received, and which form the basis for counts 2 and 3, were not gifts or loans, although most of them were carefully so labeled by appellant, but were of several types: (1) compensation for promoting a book called "Gus the Great"; (2) compensation for promoting the career of an aspiring singer; (3) interest; (4) compensation for settling a row between some vending machine operators; (5) moneys obtained from Jones by trick; (6) moneys obtained from one Stemler by trick, and (7) "life story income". Items (1) to (6), which all relate to count 2 (the year 1957), total $14,150. "Life story income" for that year was at least $32,500, and for 1958 was at least $56,200.00. Only this type of income is involved in count 3 for 1958. Appellant attacks only the evidence relating to "life story income" for the two years in question, and cites, in his briefs, only certain portions of the evidence favorable to him. It would unduly prolong this opinion to discuss the evidence. We have examined the portions cited by the government, and such additional portions as we deem necessary to convince us that there was ample evidence to sustain a finding that all such income was obtained by fraud and that a substantial part of it was also obtained by extortion. Appellant's explanations are incredible to us; no doubt they were equally incredible to the jury.

6. *The court did not err in refusing appellant's proposed instructions as to the California law of theft.*

This contention relates only to counts 2 and 3. Appellant's proposed instructions (63, 74–80 inclusive) would first have told the jury that the government was charging him with committing certain crimes under state law, and that it must prove the commission of those

2. Nemec v. United States, 9 Cir., 1949, 178 F.2d 656; Ziegler v. United States, 9 Cir., 1949, 174 F.2d 439; Enriquez v. United States, 9 Cir., 1951, 188 F.2d 313; Kobey v. United States, 9 Cir., 1953, 208 F.2d 583; Mitchell v. United States, 9 Cir., 1954, 213 F.2d 951; Bateman v. United States, 9 Cir., 1954, 212 F.2d 61; Benatar v. United States, 9 Cir., 1954, 209 F.2d 734; Herzog v. United States, 9 Cir., 1955, 226 F.2d 561; Brown v. United States, 9 Cir., 1955, 222 F.2d 293; Herzog v. United States, 9 Cir., 1956, 235 F.2d 664, 665; Percifield v. United States, 9 Cir., 1957, 241 F.2d 225; Pool v. United States, 9 Cir., 1958, 260 F.2d 57; Davenport v. United States, 9 Cir., 1958, 260 F.2d 591; Harris v. United States, 1958, 9 Cir., 261 F.2d 897; Holt v. United States, 9 Cir., 1959, 272 F.2d 272; Bieber v. United States, 9 Cir., 1960, 276 F.2d 709; Ryan v. United States, 9 Cir., 1960, 278 F.2d 836; Cooper v. United States, 9 Cir., 1960, 282 F.2d 527; Claypole v. United States, 9 Cir., 1960, 280 F.2d 768.

3. See: Benatar v. United States, 9 Cir., 1954, 209 F.2d 734; Mitchell v. United States, 9 Cir., 1954, 213 F.2d 951; Herzog v. United States, 9 Cir., 1956, 235 F.2d 664; Percifield v. United States, 9 Cir., 1957, 241 F.2d 225; Pool v. United States, 9 Cir., 1958, 260 F.2d 57; Holt v. United States, 9 Cir., 1959, 272 F.2d 272; Bieber v. United States, 9 Cir., 1960, 276 F.2d 709; Ryan v. United States, 9 Cir., 1960, 278 F.2d 836.

crimes beyond a reasonable doubt, and would then have defined the crimes. California subsumes various common law crimes under the general head of "theft". (West's Ann.Calif.Pen.Code, § 484ff) The definitions proposed relate to larceny by trick and device, embezzlement, and false pretenses.

The court did define embezzlement, and told the jury that embezzled moneys are not taxable income. It is not claimed that the court's definition was erroneous. We therefore do not consider appellant's proposed instruction 75.

As to the others, they were designated by the court in its "advice to counsel" as "refused"; so it can be said that counsel did specifically object to them. But he did not, as required by Rule 30, F.R.Crim. Proc., "state distinctly the [or any] grounds of his objection." (See discussion under heading 4, supra.)

The "grounds", however, might be said to be apparent from the instructions themselves, and we will therefore consider the question. We think there is nothing in the point. The government was not trying to prove crimes under the laws of California (or, for that matter, of New York or Illinois or Ohio or Florida, where some parts of some transactions occurred). It was trying to prove the receipt by appellant of income which appellant wilfully failed to report. As is stated in Davis v. United States, 6 Cir., 1955, 226 F.2d 331, at p. 334:

"[T]he gains to the recipient which are subject to taxation may not only be unlawful gains of a civil nature, but may also be unlawful gains of a criminal nature."

and again, at p. 335:

"Appellant makes much of the fact that the government has not fixed a label of some kind on the funds that he took from his corporation. It is not necessary to describe them as additional salary, illicit bonuses, or commissions, or anything more than wrongful diversions, since, as above mentioned, substance controls over form, and taxation is concerned with the actual command over the property taxed."

See also Wallace v. United States, 4 Cir., 1960, 281 F.2d 656, 664; Dawkins v. Commissioner, 8 Cir., 1956, 238 F.2d 174.

■ The law defines gross income as including "all income from whatever source derived." (26 U.S.C. § 61). Gifts are excluded (26 U.S.C. § 102), and the court so told the jury. Loans, (i. e., borrowed moneys) are excluded as not being "income", and the court so told the jury. The court told the jury that "[t]he tax is imposed on gains or income whether acquired in a lawful or in an unlawful manner". It then specifically excluded embezzled moneys and "the proceeds of bona fide loans and gifts". This, we think, was correct. The Federal law defines income and is not dependent for its effect upon whether income so defined is received in violation either of a civil obligation to some individual imposed by the law of a state, or of a criminal law of a state, or of both or neither. (Marienfeld v. United States, 8 Cir., 1954, 214 F.2d 632, 636; Daine v. Commissioner, 2 Cir., 1948, 168 F.2d 449, 451, 4 A.L.R.2d 248 and cases there cited)

■ The proposed instruction 63 would have placed upon the government the burden of proving, beyond a reasonable doubt, that Cohen had committed the crimes described in detail in proposed instructions 74, 76, 77, 78, 79 and 80. The government had no such burden. The injection into the instructions of the definitions of California crimes could only have confused the jury; their rejection was correct.

7. *Moneys obtained by fraud were taxable in the years in question (1957 and 1958).*

■ This contention likewise affects only counts 2 and 3. It has long been held that gains unlawfully obtained are taxable income. (See, e. g., United States v. Sullivan, 1927, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037) And this rule has repeatedly been applied to moneys obtained by various frauds. (Akers v. Sco-

field, 5 Cir., 1948, 167 F.2d 718; Rollinger v. United States, 8 Cir., 1953, 208 F.2d 109; Kann v. Commissioner, 3 Cir., 1953, 210 F.2d 247; Marienfeld v. United States, 8 Cir., 1954, 214 F.2d 632; Briggs v. United States, 4 Cir., 1954, 214 F.2d 699; Berra v. United States, 8 Cir., 1955, 221 F.2d 590; Davis v. United States, supra, 6 Cir., 1955, 226 F.2d 331; cf. United States v. Bruswitz, 2 Cir., 1954, 219 F.2d 59; United States v. Wyss, 7 Cir., 1957, 239 F.2d 658.)

The only exception to this general rule to which our attention has been called is Commissioner v. Wilcox, 1946, 327 U. S. 404, 66 S.Ct. 546, 90 L.Ed. 752, which held that embezzled moneys are not taxable income. It was overruled in James v. United States, 1961, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246, by a majority of 6 to 3. In the meantime, and long before the taxable years here in question, the Supreme Court had decided, in Rutkin v. United States, 1952, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, that moneys obtained by extortion were taxable income. In its opinion in Rutkin, the court re-asserted the principle that "[a]n unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it" (343 U.S. p. 137, 72 S.Ct. p. 575). It also said: "There is little doubt now that where unlawful gains are secured by the fraud of the taxpayer they are taxable". (343 U.S. p. 138, 72 S.Ct. p. 576) And it expressly limited Wilcox "to its facts".

In sum, then, at the times here in question, the law was that all unlawful gains, including those procured by fraud and extortion, were taxable, with but one exception—embezzled money (an exception later eliminated in James). The Supreme Court itself made this clear in Rutkin.

 Nor can appellant successfully assert, in the face of the record in this case, that he had doubt as to whether his ill-gotten gains were taxable, because, forsooth, neither the Supreme Court nor this court had directly decided that income includes the proceeds of fraud. The record would support a finding that he knew that such gains were taxable, and that he deliberately arranged his affairs so as to make them appear to be loans. (See Spies v. United States, 1943, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 and the concurring opinion of Mr. Justice Harlan in James, supra, 366 U.S. at pp. 242–244, 81 S.Ct. at p. 1057.) For obvious reasons, he did not arrange them to appear to be embezzlements.

The foregoing are all of the contentions raised that affect counts 2 and 3. Since we have found them to be unavailing, we do not consider appellant's contentions that relate only to counts 5, 8, 9 and 10, because the sentences upon counts 5 and 9 are concurrent with the sentence under count 2, and those under counts 8 and 10 are concurrent with that under count 3. See footnote 1, supra.

*8. Cohen has not been placed in double jeopardy.*

This contention affects count 4. The record shows that Cohen was convicted, in 1951, on three counts of an indictment which charged willful attempt to evade and defeat income tax for the respective years 1946, 1947 and 1948, by filing false tax returns, in violation of Section 145 (b), 1939 I.R.C. (Cohen v. United States, 9 Cir., 201 F.2d 386.) Necessarily, all of the evidence on the basis of which he was convicted must have related to a period antedating the conviction. In this case, it is charged in count 4, that: "[c]ommencing on or about the 10th day of October, 1955 * * * Cohen did wilfully and knowingly attempt to evade and defeat the payment of income taxes then due and owing * * * for the years 1945 to 1950, inclusive, and duly assessed against him as follows: * * * ". All of the evidence in the present case concerns the period beginning October 10, 1955.

 Section 145(b) (1939 Code) and Section 7201 (1954 Code) both make one guilty of an offense who "willfully attempts in any manner to evade or defeat *any tax* imposed by this chapter *or the*

*payment thereof * * *.*" (emphasis added). The government says that a willful and knowing attempt to evade the *payment* of tax is different from a willful and knowing attempt to evade and defeat the *tax*. There is support for this position in the disjunctive form in which the statute is cast. There are also practical reasons for giving the statute a disjunctive effect. The income tax law is one under which the taxpayer is required to assess himself. This is the first, and fortunately in most cases the final, means by which the amount of tax owing is determined. One can thus evade and defeat the tax by a combination of such things as failing to file a return, filing a false return, failing to keep records, concealing income, or other means. (Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418.) These things can evade or defeat the tax in the first instance by preventing an assessment of it, either by the taxpayer or by the Commissioner. Basically, these are the kinds of things that Cohen did and for which he was convicted in 1951. The Commissioner assessed the taxes *after* he was convicted. Over four years later, beginning when he was released from prison, Cohen set about obtaining large sums of money, and by the various means listed in the present indictment, seeing to it that none of that money went to pay the taxes so assessed. That is what he was convicted of doing in 1961. Surely the two offenses are not necessarily the same.

The precise distinction that we have in mind, between evading and defeating the tax and evading and defeating its payment, was made by the Court of Appeals for the Second Circuit in United States v. Mollet, 1961, 290 F.2d 273, 274. Cf. Wilson v. United States, 9 Cir., 1957, 250 F.2d 312, 318; United States v. Bardin, 7 Cir., 1955, 224 F.2d 255, 259–260. None of these cases decides the question now before us, but each of them does recognize that the statute, or one containing the same language, does define at least two separate crimes, viz., attempt to evade or defeat tax and attempt to evade or defeat payment of tax.

Moreover, even if we assume that but one crime is defined, the result would be the same. The question was presented and decided adversely to appellant by this court in Norwitt v. United States, 9 Cir., 195 F.2d 127, at p. 133, where we said:

> "The appellant correctly states that 'An attempt to evade a tax and the payment thereof is not a continuing offense.' His error, however, occurs in the sentence immediately following: 'While there may be such a crime in each year for which an income tax is due, once the attempt has been consummated by the filing of a false and fraudulent return in any particular year, the offense has been completed for that year, and nothing done thereafter to carry out the initial unlawful purpose for such year can constitute a new offense'.

> \* \* \* \* \* \*

> "The appellant's argument can be reduced to an absurdity. A man attempts to assassinate the President of the United States on January 1, 1952. He escapes arrest, and tries the same thing the next day. He keeps up this record of poor marksmanship and swift flight for every one of the 366 days of the year. Is he guilty of but one attempt against the President's life—or of 366?

> "The analogy with several attempts to evade an income tax for the same year is complete. In the one case, the missed target is the same human being; in the other, the public fisc for the same year."

This case graphically illustrates the validity of the foregoing reasoning. Here, Cohen's prior convictions were for conduct occurring before June, 1951, while the present conviction is for entirely different conduct, occurring after October 10, 1955. See Morgan v. Devine, 1915, 237 U.S. 632, 35 S.Ct. 712, 59 L.Ed. 1153; Albrecht v. United States, 1927, 273 U.S. 1, 47 S.Ct. 250, 71 L.Ed. 505; United States v. Noveck, 1927, 273 U.S. 202, 47 S.Ct. 341, 71 L.Ed. 610. Thus,

the evidence that is required to sustain the present conviction must, on the face of the matter, be different from that required to sustain the prior conviction.

9. *The court correctly ruled that taxes had been duly assessed against Cohen for the years 1945 to 1950, inclusive.*

This contention involves counts 4, 5, 8, 9 and 10. Essentially, the contention is that the so-called 90-day letters required by Section 272 of the 1939 Internal Revenue Code [4] were not sent to Cohen by registered mail *"at his last known address."* The court ruled, as a matter of law, that the notices had been so mailed, and instructed the jury that the assessments were valid. The point has been properly preserved so that we are required to consider it.

Count Four charges that, "commencing on or about the 10th day of October, 1955 and continuing to the return of this indictment [Sept. 16, 1960] * * * Cohen did wilfully and knowingly attempt to evade and defeat the payment of income taxes then due * * * for the years 1949 to 1950, inclusive, and duly assessed against him as follows: (1) on July 12, 1951, in the amount of $62,976.98 as to the years 1945 to 1947, inclusive; (2) On July 12, 1951, in the amount of $58,988.04 as to the year 1948, and (3) on November 1, 1952, in the amount of $13,882.92 as to the years 1949 and 1950 * * * " by means heretofore outlined in this opinion.

Thus the amount involved for the years 1945–8, inclusive, is $121,965.02 and for the years 1949 and 1950, $13,882.92, a total of $135,847.94. These figures do not include interest and penalties. They give credit for payments totalling $310, made before October 10, 1955. There were none thereafter. The record amply demonstrates that during the years 1955–60 well over $350,000 was available to Cohen and that, in spite of efforts by the government to collect, he successfully and willfully evaded and defeated the payment of any part of the assessments, by all of the means listed in the indictment and by other means as well. Meanwhile, he lived and spent money lavishly.

The facts as to the assessments are not disputed. Jeopardy assessments (§ 273 (a)) as to the years 1945, 1946, 1947 and 1948 were made on July 12, 1951. The next day, July 13, notice and demand for payment were personally served upon Cohen, who was then in the Los Angeles County Jail. He was there because, on June 10, he had been found guilty on charges of willful attempt to evade income taxes for 1946, 1947 and 1948, and had been sentenced on July 9 to five years. An appeal and a petition for admission to bail were pending. For some years, Cohen had been married to LaVonne Cohen, and they had lived in a residence at 513 Moreno Avenue, Los Angeles 49, California. This was the address given on their joint returns for 1948, 1949 and 1950. The prior returns involved were separate.

Within 60 days after July 13, 1951 (see § 273(b)), notices—90-day letters (see § 272(a) and (k))—were mailed to Cohen at the Moreno Avenue address. This was done on August 9, 1951. One letter, addressed to Cohen alone, related to the years 1945–7; another, addressed to Cohen and his wife, related to the year 1948. On August 9, the Moreno Avenue home was still the home of the Cohens, and the wife was living there. The Internal Revenue Agent knew that Cohen was still in the Los Angeles County Jail, but the Commissioner had not been notified by either spouse that separate residences had been established. (See § 272 (a)).

The 90-day letter, as to the years 1949 and 1950, was mailed to the Cohens on May 8, 1952, at the Moreno Avenue address. There was no jeopardy assessment for these years. The assessments were made on October 9, 1952. On May 8, 1952, Cohen was in the Federal penitentiary at MacNeil Island and his wife was no longer at the Moreno Avenue residence, having left it the preceding Sep-

---

4. All references to the statute are to the Internal Revenue Code of 1939, unless otherwise noted.

tember. Cohen's appeal was still pending. Again, neither spouse had notified the Commissioner that separate residences had been established. There is no evidence that government agents knew that Mrs. Cohen was no longer living at the Moreno Avenue residence. Undoubtedly the Internal Revenue Agents knew that Cohen was at MacNeil Island.

Each letter was sent by registered mail, and was not returned to the government. Return receipts were not requested. There is no direct evidence that Cohen either did or did not receive the letters, although both Cohen and his former wife (they were later divorced) testified. When the letters were sent, the address on Moreno Avenue was the last address appearing in the accumulative file on Cohen's tax liabilities that was used by the employee of the Commissioner who prepared the letter.

Neither side asked the Court to submit the question of the validity of the assessments to the jury. The government maintained that, as a matter of law, they were valid, the defendant, that they were not. The applicable statute states that "the Commissioner is authorized to send notice of such deficiency to the taxpayer by registered mail". (§ 272(a)). The same statute also provides: "In the case of a joint return filed by husband and wife such notice of deficiency may be a single joint notice, except that if the Commissioner has been notified by either spouse that separate residences have been established, then, in lieu of the single joint notice, duplicate originals of the joint notice must be sent by registered mail to each spouse at his last known address." Subsection (k) of section 272 provides: "In the absence of notice to the Commissioner under section 312(a) of the existence of a fiduciary relationship, notice of a deficiency in respect of a tax imposed by this chapter, if mailed to the taxpayer at his last known address, shall be sufficient for the purposes of this chapter even if such taxpayer is deceased, or is under a legal disability, or, in the case of a corporation, has terminated its existence."

We think it clear that the Congress, when it "authorized" service by registered mail, did not intend to require actual receipt by the addressee of the letter. Rather, it permitted the use of a method of giving notice that would ordinarily result in such receipt. Failure to petition the Board of Tax Appeals (now the Tax Court) within 90 days of the mailing of the letter does deprive the taxpayer of a privilege, namely, withholding payment of the tax pending determination of the validity and correctness of the assessment by the Board (Tax Court) (§ 272(a)), and litigating the matter before the Board (Tax Court). (See Ginsburg v. United States, 1 Cir., 1960, 278 F.2d 470.) But it does not deprive him of all right to contest the validity or correctness of the assessment; he can still do this by paying the tax, filing a claim for refund, and if that be denied, suing in the District Court or Court of Claims. (e. g. Van Antwerp v. United States, 9 Cir., 1937, 92 F.2d 871). And if he wins, he gets his money back, normally, with interest. We have no doubt that the Congress, if it chose to do so, could have required the taxpayer to pay first and then litigate, in all cases. (Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289, 1931) Particularly because this is so, we find no constitutional weakness in the use of the authorized method of sending the 90-day letter, even in those cases where it may not actually be received. The cases cited by appellant (Mullane v. Central Hanover Bank & Trust Co., 1950, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865; Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178) deal with the cutting off of all rights, not of one of two alternative remedies provided to the taxpayer by the Congress as a matter of grace.

The statute, however, requires a proper giving of notice. (§ 272(a)).[5]

5. Steiner v. Nelson, 7 Cir., 1958, 259 F.2d 853; United States v. Williams, D.C.E.D.N.Y. 1958, 161 F.Supp. 158.

We think that the letters relating to the years 1945–7 and 1948 were in fact and in law sent to Cohen's "last known address." The Commissioner normally deals with a taxpayer who has a residence or other address which is on record with the Commissioner through the taxpayer's own tax returns. That is the situation here. The Commissioner or one of his agents may learn that the taxpayer has changed his address, or he may be so advised by the taxpayer. In such a case, he must use the new address. The Commissioner or one of his agents may also learn that the taxpayer is temporarily sojourning elsewhere, as in a hotel or hospital or vacation resort or jail, or even abroad, while still retaining the same "permanent" address. He is not required to treat the address of temporary sojourn as the "last known address". To so require would place an impossible administrative burden on the Commissioner. More important, it could in many cases defeat the objective of the statute by making it less rather than more likely that a letter mailed to the taxpayer would be received. This is because the taxpayer may no longer be at the temporary address when the letter is mailed. The Commissioner can hardly make a daily check to see when the taxpayer may leave such temporary address.

 In a sense, Cohen had two addresses on August 9, 1951. One was of a permanent character—his residence. The other was temporary, so far as the Commissioner then knew—the jail. We think that, absent a designation by Cohen to the Commissioner of the jail as his "address", the Commissioner properly treated the residence as his "address". The use by the Congress of the word "residence" in relation to joint returns strengthens this view.

 In the case of the 1948 letter, another factor sustains the validity of the mailing. The return for that year was joint. The Moreno Avenue address was admittedly still Mrs. Cohen's address—and residence. The Commissioner had not been notified that "separate residences" (the words used by the statute) had been established. The mailing was therefore in exact and literal compliance with the statute. The liability being joint, and the normal relationship between spouses being close, Congress could well consider that receipt of the notice by either spouse would be well calculated to give actual notice to both, even though one spouse may be temporarily absent.

 There is another reason why the assessments for 1945 through 1948 were valid, at least sufficiently to sustain a conviction of wilfully attempting to evade and defeat their payment. They were jeopardy assessments. Section 273 authorizes the making of such assessments, and provides in subdivision (f) that the taxpayer may stay collection by giving a bond in the manner prescribed in that subsection. We particularly note that the section requires that the bond be given "within ten days after notice and demand from the Collector for the payment of the amount of the assessment", not within any time limited upon or affected by the mailing of a 90-day letter under Section 272(a). It is clear that unless the bond is given, the Commissioner may proceed to collect by legal process, even though a proceeding is pending for review of the assessment in the tax court. In other words, the provisions of Section 272(a) restricting the assessment and collection of deficiencies do not apply to a jeopardy assessment. It follows that the only purpose of the 90-day letter which is to be sent after the making of a jeopardy assessment (Section 273(b)), is to start the time running within which the taxpayer can petition the Board of Tax Appeals and to limit that time. (cf. Mason v. Commissioner, 5 Cir., 1954, 210 F.2d 388) If we were of the opinion (which we are not) that the deficiency letters for the years 1945–48 were improperly addressed, this would not mean that the jeopardy assessments are invalid. The law is clear that in the case of such assessments a proceeding before the Board of Tax Appeals does not stay the Com-

missioner's hand and that he cannot be enjoined from enforcing the assessment. It is equally clear that this provision of the law is constitutional. (Continental Products Co. v. Commissioner, 1 Cir., 1933, 66 F.2d 434; Dyer v. Gallagher, 6 Cir., 1953, 203 F.2d 477; Darnell v. Tomlinson, 5 Cir., 1955, 220 F.2d 894; Lloyd v. Patterson, 5 Cir., 1957, 242 F.2d 742; Melvin Building Corporation v. Long, 7 Cir., 1958, 262 F.2d 920; Ginsburg v. United States, 1 Cir., 1960, 278 F.2d 470)

Cohen admittedly received, by personal delivery to him, the notice and demand specified in Section 273(a). He did not give the bond required to stay collection by Section 273(f). Thus, even though his time to petition the tax court may not have expired, the Commissioner had the right and still has the right to enforce payment of the assessment. It was this payment that Cohen was convicted of wilfully attempting to evade and defeat under count 4. His obligation to pay upon receipt of notice and demand is stated in Section 6155 of the 1954 Code, which was in effect during all of the years (1955 to 1960) when he was wilfully attempting to evade and defeat it. A similar obligation was, of course, imposed by the 1939 Code. (See Sections 272(a), 273(a), (g) and (i))

■ The foregoing, however, does not apply to the 1949–50 taxes. There was no jeopardy assessment for those years. When the 1949–50 letter, which also related to joint returns, was mailed, the situation had changed in two respects. Cohen was then in MacNeil Island, his applications for bail having been unsuccessful. Mrs. Cohen no longer lived on Moreno Avenue, but there is no evidence that the Commissioner knew this, nor had either spouse notified him of the establishment of "separate residences". The Commissioner's knowledge that Cohen was in MacNeil Island was not knowledge that Cohen and his wife had established "separate residences". One does not change his residence to the prison by virtue of being incarcerated there. (American Surety Co. of New York v. Cosgrove, 40 Misc. 262, 81 N.Y.S. 945; Metropolitan Life Ins. Co. v. Jones, 192 Ark. 1145, 97 S.W.2d 64, 66; United States v. Gronich, D.C.W.D. Wash., 211 F. 548; Neuberger v. United States, 2 Cir., 1926, 13 F.2d 541, 542–543 and cases there cited) Thus, again, when the Commissioner sent the notice to Moreno Avenue, he was in literal compliance with the statute.

■ In addition, even if the 1949–50 assessment were invalid, that would not invalidate the conviction. The evidence clearly shows an attempt—wholly successful—to evade and defeat the payment of *any* taxes for the five years in question. We cannot believe that the result would have been affected in the slightest if the Court had told the jury that the 1949–50 assessment was void and to be disregarded. Those years involved only $13,882.92 out of a total of $135,847.94 in taxes.

The cases upon which Cohen relies are not contrary to the decision here made. Our decision in Boren v. Riddell, 9 Cir., 1957, 241 F.2d 670 holds that a 90-day letter served upon the taxpayer by ordinary mail is effective if the taxpayer actually receives it. There is language in the opinion from which it might be inferred that actual receipt is necessary even where the letter is sent by registered mail to the correct address, but this question was not before the Court, and the opinion expressly limits the decision to the facts presented. Commissioner v. Stewart, 6 Cir., 1951, 186 F.2d 239, is similar. There, notice was sent to the taxpayer's attorney and the taxpayer petitioned the Tax Court within 90 days thereafter. It was held that the purpose of the statute had been accomplished. In Dolezilek v. Commissioner, D.C.Cir., 1954, 94 U.S.App.D.C. 97, 212 F.2d 458, notice was mailed to a correct address, but returned to the government. The government then caused it to be personally served on the taxpayer. It was held that the 90-day period started with the time of mailing. The holding supports our conclusion. The dissent, cited by us in Boren, would

have the 90-day period begin with the actual delivery of notice. We came to the latter conclusion in Tenzer v. Commissioner, 1960, 285 F.2d 956. In that case notice was sent by registered mail and returned to the government; personal service of notice was then made. We concluded, citing Boren and the dissent in Dolezilek, that the 90 days ran from the time of personal service, basing our holding on considerations of fairness, and stating: "when the Commissioner chose personal service, he abandoned the other method." (p. 958) We also said: "we also hold when the notice was correctly addressed, registered and mailed that the first notice was not wholly void. (For example, it was probably good enough to arrest the statute of limitations.)" (p. 958) Apparently, we had not made up our minds as to which date should govern when we decided Rosewood Hotel, Inc. v. Commissioner, 9 Cir., 1960, 275 F.2d 786. We did so in Tenzer. But all of these cases deal with the time when the 90-day period starts; in each of them notice had actually been received. None decides what the correct rule is when notice is sent, by registered mail, to the last known address of the taxpayer, and not returned to the government, and when that is the only notice given. Barack v. United States, D.C.Mo., 1956, 56–2 USTC Par. 9961, cited by Cohen, dealt with a prisoner incarcerated under a final judgment, and in any event, is not binding on us.

The cases that do deal with this question hold that the notice is sufficient. Cf. Pfeffer v. Commissioner, 2 Cir., 1959, 272 F.2d 383; cf. Williams v. United States, 6 Cir., 1959, 264 F.2d 227; see Clark's Estate v. Commissioner, 2 Cir., 1949, 173 F.2d 13; Gregory v. United States, 1944, 102 Ct.Cl. 642, 57 F.Supp. 962. (Gregory is criticized in our decision in Maxfield v. Commissioner, 1946, 153 F.2d 325, insofar as it decided that a particular address was the last known address, but the facts of that case were very different. Here it is clear that the Moreno Avenue address was the last known permanent or residence address of Cohen. We did not hold in Maxfield, or in any other decision, either that mailing to such an address is insufficient, or that there must be, in the case of such mailing, affirmative proof that the taxpayer actually received the letter. The legislative history, cited in Gregory, makes it clear that Congress did not intend such a requirement.)

No other contentions are made that relate to count 4. We therefore do not consider contentions relating to count 13, because the sentence under that count is concurrent with that under count 4. (Note 1, supra)

When sentencing Cohen, the Court made the following statement:

"[T]he record shows that within a very short time of his release, Mr. Cohen was in full flight on a profligate style of living financed by many fraudulent or extorted so-called 'loans' in a very large aggregate amount. The fact that the defendant ingratiated himself into at least a speaking acquaintance with a number of prominent and respectable people and that he used them and their names in effecting his frauds does not minimize his misconduct in which neither religion, patriotism or friendship, nor human kindness, sorrow or fear were excepted by Mr. Cohen as a means toward his unprincipled ends.

"The evidence shows, to my mind with shocking clarity, that Mr. Cohen has not, and will not, pay any income taxes he can evade and defeat. Living on the luxury of the land, available to only a fortunate few of our people, Mr. Cohen has no notion of contributing anything to the cost of defending or maintaining the land affording him that luxury."

We agree.

The judgment is affirmed.